### The People *vs.* Elihu Mather.

The crime of *conspiracy* to affect an unlawful act is perfect when the agreement to do the act is concluded; no *overt act* is necessary to be shewn.

All who accede to a conspiracy after its formation, and while it is being executed, becomes conspirators.

When a new party, with a full knowledge of the facts, *concurs* in the plans of the conspirators as originally formed, and comes in and aides in the execution of them, he is from that moment a fellow conspirator; his concurrence, without particular proof of an agreement to concur, is conclusive against him. He commits the offence whenever he agrees to become a party to the transaction, or does any act in furtherance of the original design.

NEW-YORK,
May, 1830.

The People
v.
Mather.

The fact of *conspiring* need not be proved; if parties concur in doing the act, although they were not previously acquainted with each other, it is a conspiracy.

If the agreement be entered into in *one* county, and the conspirators go into *another* county to execute their plans of mischief, and there commit an overt act, they may be punished in the latter county without any evidence of an express renewal of the agreement; such overt act of any one of the conspirators, in furtherance of the common design, is considered in law a renewal or rather continuance of the original agreement by all the conspirators.

The *venue* may be laid in the county where the agreement was entered into, or where an overt act was done by any of the conspirators in furtherance of their common design.

A *conspiracy* to commit a misdemeanor is not merged in the misdemeanor the result of the conspiracy when committed; where the crime perpetrated is of a higher grade of offence than a misdemeanor, the misdemeanor is merged in the crime.

In an indictment for a conspiracy, it is not necessary to set forth the overt acts relied on as evidence of the defendant's guilt, where a legal offence is charged, e. g. a conspiracy to assault and false imprison a citizen. The unlawful agreement is sufficient to convict. It is usual but not necessary, after stating the conspiracy, to allege that in pursuance of it certain acts were done.

An indictment for conspiracy, charging the defendant to have conspired with divers persons to the jurors unknown, is good, notwithstanding that the co-conspirators are known to the jury, and their names might have been set forth.

A *challenge* to a juror for *principal cause* was sustained where the juror had said that he believed the defendant was guilty, although he testified that he had no fixed opinion upon the subject of the defendant's guilt; that he only entertained impressions derived from history and common reports, meaning thereby printed statements in papers and reports in conversation; that he had never heard witnesses to the transaction testify, nor say any thing on the subject in question; if the evidence supported the circumstances he had heard, he had a fixed belief respecting the guilt of the defendant; if those circumstances should be done away by evidence, he should not consider him guilty; if those circumstances should not be proved, his present belief would be removed.

So a juror was held properly excluded, on a *challenge* to the favour, who testified that he had formed, though he had not expressed an opinion that the defendant was guilty. His opinion was formed upon reports and what he had read. On the trial of a former challenge, he had heard a witness testify respecting the subject in question. His opinion was made up previous to hearing that testimony, but what the witness had stated had tended to strengthen his opinion. He had read reports of trials and affidavits or statements under oath relating to the same subject. His opinion was made up from reading them and other matters.—And the charge of the judge to the triors in this case was approved, in which he instructed them that if they believe that the juror had a fixed opinion, which it would

NEW-YORK,
May, 1830.

The People
v.
Mather.

require testimony to remove, he was disqualified, whether that opinion was founded on rumour alone or on rumour and printed statements.

A juror who has formed an opinion of the guilt of the accused is not competent to serve; although he declares that if the circumstances on which his opinion is founded are not supported by proof, his opinion of the guilt of the accused will be removed.

There is no distinction as to the grounds of the opinion formed by the juror of the guilt of the accused : whether it be founded on being an eye witness, or on hearing the testimony of those who were present at the transaction, *or* whether it be based on rumours, reports and newspaper publications ; in either case it is good cause of challenge.

When the facts on which a challenge rests are disputed, the proper course is to submit the question to *triors ;* but if neither of the parties ask for triors to settle the issue of fact, and submit their evidence to the judge, and take his determination thereon, they cannot afterwards object to his competence to decide that issue. The production of evidence to the judge without asking for triors will be considered as the substitution of him in the place of triors; and his decision will be treated in like manner as would the decision of triors, and therefore, although the determination of the judge should be against the weight of evidence, a new trial will not be granted for that cause when the defendant is acquitted, in analogy to the principle that if on the main question in a criminal case the defendant is found not guilty, there cannot be a new trial.

Where an accused party waived his right to object to a juror, against whom good cause of challenge existed on his part, *it was held*, that the public prosecutor could not insist upon having the juror excluded, under an agreement that all should be considered as challenged by both parties.

A question to a witness is *leading* which puts into his mouth the words to be echoed back, or plainly suggests the answer which the party wishes to get from him.

If it is apparent that the witness is in the interest of the adverse party, it is proper to permit the direct examination to take the character of a cross-examination.

If the question relate to introductory matter and be designed only to lead the witness with the more expedition to what is material to the issue, it may be put, though it be leading.

Putting a question in the *alternative* form, as *whether or not* a party did a certain act, specifying it, does not remove the objection to its being leading.

It is not allowable to put a question which *assumes* a fact proved, which is not, even on cross-examination.

It rests in the discretion of the court before whom a trial is had whether or not to permit the *re-examination* of a witness after the lapse of a day, and after the examination of other witnesses. The supreme court will not interfere with the exercise of such discretion but in a very flagrant case.

In a trial for a conspiracy to kidnap a person, who was actually carried off and whom it was believed was murdered, the public prosecutor asked a witness whether on a certain evening he was at the house of a certain person ? and whether on that evening a hack or covered carriage arrived there, in which carriage it was alleged the person kidnapped was ? the

NEW-YORK,
May, 1830.

The People
v.
Mather.

witness declined to answer, alleging that his answer might implicate him in the transaction respecting the person kidnapped, and might expose him to infamy, *it was held*, that the witness was not bound to answer.

When the direct answer to a question will disgrace a witness and fix a stain of infamy upon his character, he is not bound to answer ; and that whether the question be material or not to the merits of the cause in which he is examined. It is not enough, however, for the witness to allege that his answer will have a tendency to expose him to infamy or disgrace ; the question must be such that the answer to it, which he may be required by the obligation of his oath to give, will *directly* shew his infamy, and the court will see that such must be the case, before they will allow the excuse to prevail.

Where the answer to a question will have a tendency to implicate the witness in a crime or misdemeanor, or will expose him to a fine or forfeiture, he is *not bound to answer ;* and when he claims to be excused from answering, the court are to determine whether the answer he may give to the question can criminate him directly or indirectly by furnishing evidence of his guilt, or by establishing one of many facts, which together may constitute a chain of testimony, sufficient to warrant his conviction, but which one fact of itself could not produce such result ; and if they think the answer *may* in any way criminate him, they must allow his privilege without exacting from him to explain how he would be criminated by the answer, which the truth may oblige to give.

The proper question to be put to a witness called to impeach another is, whether he would believe him on oath. The opposite party may then go into a cross-examination to ascertain the grounds of the unfavorable opinion, the means of knowledge of the character of the witness impeached, and the source, extent and duration of the unfavorable reports.

The crime of an accessary before the fact to a murder is *murder*, and is not barred by the statute of limitations.

Whether a *new trial* can be awarded in a criminal case for the misdirection of the court, where there has been an acquittal of the accused by the jury, is an unsettled question ; if the power exists, it will not be exercised unless it is reasonable to infer that the acquittal was induced by such misdirection.

THIS case was tried at the Orleans circuit in November, 1829, before the Hon. ADDISON GARDNER, one of the circuit judges. The trial occupied *ten* days.

The *defendant* was indicted as a conspirator in the abduction of William Morgan. The indictment contained six counts, but three of which, viz. the second, third and fifth counts were relied upon at the trial. The *second* count charged, that on the 13th September, 1826, at Gaines, in the county of Orleans, the defendant, with divers persons unknown to the jurors, did conspire, combine, &c. to assault William Morgan, and falsely imprison him, and to carry him off and

secrete him in places to the jurors unknown; and that in pursuance of such conspiracy the defendant and the other unknown persons at Gaines aforesaid, did assault William Morgan, and against his will, &c. did imprison him, and unlawfully, forcibly and against his will did carry him off to places unknown to the jurors. The *third* count charged, that the defendant with divers unknown persons, at &c. on, &c. did conspire to break the peace and to commit an assault on William Morgan, and to imprison him without any legal warrant or justifiable cause, and to kidnap and carry him off against his will. The *fifth* count charged, that the defendant, on, &c. at, &c. in and upon William Morgan did make an assault, and him did beat, &c. and him then and there unlawfully, and injuriously and against his will, and against the laws of the state, and without any legal warrant or justifiable cause, did keep and detain for a long space of time, to wit, for two months thence next following, and other wrongs, &c. The indictment and other proceedings were brought up into the supreme court by *certiorari*, and sent down to be tried at the Orleans *circuit*.

On the empannelling of the jury, *Stephen Martin, junior,* was called as a juror, against whom the defendant's counsel interposed a principal cause of challenge, that he had formed and expressed an opinion in relation to the guilt of the defendant. A witness was called by the defendant who testified that he had heard Martin say that the masonic institution was corrupt, and in proof of it, he said that he believed that Morgan had been carried away by masons alone ; that Morgan had been carried along the ridge road in a carriage by Mather, and that Mather knew that Morgan was in it, and ,. believed that he was guilty. The public prosecutor, for the purpose of reducing the challenge from that of a principal challenge to a challenge to the favor, offered to prove by the juror challenged, that the expressions testified to have been made by him, were made from common reports ; this proceeding was objected to, but the objection was overruled and Martin testified that he had no fixed opinion upon the subject of the defendant's guilt, other

NEW-YORK,
May, 1830.

The People
v.
Mather.

NEW-YORK.
May, 1830.

The People
v.
Mather.

than such impressions as are formed upon history and com-mon reports ; the reports and history he said which he referred to, were printed statements in papers and reports in conversation, and were not derived from any witnesses to the transaction, he never having heard any witnesses on the subject of Morgan's abduction testify in court nor say any thing about it; if the evidence supported the circumstances he had heard, he had a fixed belief respecting the guilt of the defendant ; if those circumstances should be done away by evidence, he should not consider him guilty ; if those cir-cumstances should not be proved, his present belief would be removed. The judge decided that the challenge as a princi-pal challenge for cause was sustained, and set aside the juror ; to which decision the *public prosecutor* excepted.

A principal challenge for cause was made to *Samuel Clark*, another juror. He testified that he had formed an opinion as to the defendant's guilt, but had not expressed it. The judge overruled the challenge. He was then challenged to the favour by the defendant's counsel, and two triors ap-pointed and sworn. The juror was again sworn, and testified that he had formed an opinion that the defendant was guilty. On his cross-examination, he stated that his opinion was formed upon reports and upon what he had read. On the trial of a previous challenge, he had heard a witness tes-tify that he told the challenged juror that he had seen the de-fendant drive the carriage supposed to contain Morgan. His opinion was made up previous to hearing that testimony, but what the witness stated would have a tendency to strengthen his opinion. He further stated that he had read several accounts of the abduction of Morgan, and believed that he had read some reports of some trial, but what trial he did not know, but believed it related to the persons who were con-cerned at first at Canandaigua ; he thought he had read some affidavits, depositions . or statement on oath. His opinion was made up from reading them and other matters. The judge charged the triors that if they believed that the juror had now a fixed opinion, which it would require testimony to remove, he was disqualified, whether that opinion was founded on rumour alone or on rumour and printed state-

ments. The counsel for the prosecution excepted to the charge. The triors pronounced the juror not indifferent.

The panel of jurors being exhausted, five *talesmen* ·were directed to be summoned ; and it was agreed between the counsel that if challenges to the favour were made, the facts proved should be considered as demurred to by the opposite party, to enable the court to decide the challenges that should be thereafter made, reserving to each party the right to except to the decision of the court. *C. C. Ashley,* one of the *talesmen,* was examined, and testified that he had not formed or expressed an opinion as to the guilt or innocence of the defendant. On examination by the public prosecutor he stated that he was a partner of James Mather, a brother of the defendant, in the tanning business, and had been so for 18 months; that his partner was a rich man, and furnished the whole capital ; that he himself was poor, and contributed only his labor ; that he had resided with his partner for 21 months, and during all that time Morgan's abduction had never been the subject of conversation ; that he had read the newspaper accounts of the trials of Bruce and Whitney for a participation in the carrying off of Morgan ; that he thought at the time, if the witnesses swore true, that Morgan was carried off against his will, and that the defendant drove the carriage in which he was carried off; that he could not say that it was not true, but it was not clear in his mind at that time ; that his impression as to the defendant's driving the carriage remained the same as it was when he read those trials, but thought he had no fixed opinion on the subject of his guilt or innocence ; that he could hear the testimony and give it its due weight, without any struggle in his own mind. The defendant's counsel stated that they did not object to the juror. The public prosecutor insisted that under the agreement every person returned as a *talesman* was to be considered as challenged by both parties, which the judge conceded, but ruled that the defendant might withdraw the challenge on his part, although the public prosecutor contended that the inquiry being whether or not the juror was indifferent, he was disqualified to serve if his opinions were formed deliberately and had been fixed, whether

NEW-YORK,
May, 1830.

The People
v.
Mather.

for or against the defendant. The public prosecutor further contended that the juror was under a strong bias in favor of the defendant, arising from the connection in business between the defendant's brother and the juror, and that therefore he was not indifferent. The judge overruled the objection to the juror, and the public prosecutor excepted to the decisions.

*Benjamin Wright*, a witness for the prosecution, testified to a conversation he had with the defendant respecting the abduction of Morgan. The defendant named several individuals, of whom the witness recollected only the name of Bruce, as being greatly persecuted, and that unless the lodges and chapters should relieve them, or do something for them, probably they and their families must suffer, and asked the witness something about the state of the funds of the lodge and chapter in the town in which he resided. The witness asked the defendant what could induce men, of the standing of those he had named, to engage in the carrying off of Morgan? To which he replied, in substance, that it had been done probably without much reflection. After detailing the conversation between them, the witness said he had given all the conversation on the occasion alluded to, which he could recollect in words or in substance. The counsel for the prosecution then proposed to ask the witness *whether or not he in substance and effect addressed the defendant as one of those concerned in the transaction.* This question was objected to and overruled. The public prosecutor then proposed to vary the form of the question by asking the witness *how he addressed the defendant in respect to his being one of the persons concerned.* The judge decided the question to be improper ; to which decisions the public prosecutor excepted. After the examination of this witness had closed, and after a lapse of 24 hours, during which several other witnesses had testified, he was recalled by the defendant's counsel for the purpose of re-examining him on the same subject on which he had before been examined. This was objected to by the public prosecutor, but allowed by the judge.

*William P. Daniels*, a witness, was asked by the public prosecutor whether, on the evening of the 13th September,

NEW-YORK,
May, 1830.

The People
v.
Mather.

1826, he was at the house of Solomon C. Wright, in New-Fane? The witness declined to answer, on the ground that the answer might implicate him in the transaction concerning Morgan, and that it might expose him to infamy. The abduction of Morgan took place in September, 1826, and there was no indictment against the witness as a participator in that transaction. The public prosecutor therefore insisted that the statute of limitations had attached, and the answer of the witness could not criminate him, and that the rule excusing witnesses from answering questions tending to their own infamy did not apply to this case ; that an answer either way to the question put would not necessarily tend to criminate the witness, even if a prosecution were pending against him ; and that it could not expose him to any infamy. On the part of the witness it was urged that although he was not under prosecution, yet it was generally believed that William Morgan had been murdered ; that the witness might, by his answer, implicate himself as an accessary before the fact to such murder, a prosecution for which offence they contended was not barred by the statute; besides, an answer to the question might tend to expose him to infamy for being in any way concerned in the abduction of Morgan. The judge decided that the witness was not bound to answer, to which decision the public prosecutor excepted. The same question was substantially put in another form, by the witness being asked whether, on the evening before mentioned, a hack or covered carriage arrived at the house of Wright ? which was in like manner overruled.

The character for truth of a witness for the prosecution, one *Esbon Gregory*, was impeached ; the witnesses stating that the reports about him commenced about two years before the trial. The public prosecutor offered to shew that the reports alluded to had originated from a particular party or body of men in the community ; that they had been founded upon a particular transaction, which had been intentionally perverted for the purpose of injuring his character : and he offered to shew, by witnesses to be called by him, that they too had heard reports prejudicial to Gregory's character for truth, circulated by individuals belonging to a particular party

or body of men, and relating to a particular transaction; which evidence the judge refused to receive, and the public prosecutor excepted.

In the charge to the jury the judge remarked, " that if the jury were satisfied, upon a review of the testimony in relation to the removal of Morgan from the jail in Canandaigua, (as they probably would be,) that a design had been formed by Lawson, Chesebro and others forcibly to abduct or kidnap Morgan, then the inquiry would be, was the defendant a party in that agreement ?" and, after adverting to some of the evidence in the case, as that Morgan was not imprisoned in Canandaigua, in Ontario county, until the afternoon of the 12th September, 1826 : that until that time there was no evidence of any conspiracy whatever ; that Mather resided in Gaines, in Orleans county, more than 70 miles from the scene of the outrage ; that there was no evidence of any communication or concert with him ; and the fact was not shewn that he was in Canandaigua upon that or any other occasion, or that he had ever been in the county of Ontario, he added, " that it established the fact that however guilty Mather might be in aiding the execution of the conspiracy, he was not a party to it originally ;" and he further told the jury, " that although they should be satisfied that Mather assisted in carrying the conspiracy into execution after its formation, that fact, in the opinion of the court, would not constitute him a party." The charge of the judge was excepted to by the public prosecutor. The jury found the defendant *not guilty*.

The public prosecutor now moved for a new trial.

*J. C. Spencer*, special counsel, for the people.

*D. D. Barnard*, for the defendant.

*By the Court*, MARCY, J. The objection to the decision of the circuit judge in setting aside *Stephen Martin, junior*, as a juror, is, that the facts did not disclose a *principal cause of challenge* to him. The law relative to this point has been so recently and so fully considered by this court in the case of *Vermilyea and others*, (6 Cowen, 559, and 7 id. 108,) that we are saved the labor of going back to the old cases to search out, amid their contradictions, the proper rules to gov-

ern our decision on this part of the present application. This has been done, as I conceive, in a very satisfactory manner. Little more is now imposed on us than to make an application of them.

A challenge *propter affectum* is of two kinds : a challenge to the favor and for principal cause. The former is always to be determined by triors, and the latter generally by the court. If a juror has been an arbitrator in a cause involving the matter to be tried, or the counsel of one of the parties, if he is connected by blood with either of them, or if the challenge is for any other of the many matters which of themselves are supposed to constitute a valid objection to him, and the facts on which the challenge rests are admitted, the court is to pronounce the effect of such facts ; but if the facts are disputed, it seems to be the proper course to submit them to triors. (Trials per pais, 199. 1 Chit. C. L. 446, 7. 6 Cowen, 559.)

In the case of *Vermilyea*, (6 Cowen, 555,) Judge Woodworth says, when there is a dispute about the facts in the case of a principal challenge, triors are to be appointed as well as in that for favor. It was decided in that case that a challenge for principal cause formed a part of the record, and was brought up to this court by a *certiorari* along with or as a part of the record. Where the facts are not in dispute, it is supposed that an issue of law is formed by a demurrer to the challenge. The decision of this issue by the court below, when the record is duly brought up, is to be reviewed and corrected, if erroneous, by the superior tribunal. This was done in the case of *The People* v. *Vermilyea and others*, (7 Cowen, 108.)

In opposition to the application to Mr. Justice Woodworth for the allowance of a *certiorari*, it was urged that the facts in that case made out only a challenge for favor, and that the judge at the trial was substituted in the place of triors by the consent of parties, and the question then raised was to be viewed in the same light as if it had been decided by the latter. The judge admits that the argument would be well founded if the facts had not established a principal cause of challenge. The only act that was done in that case to sub-

NEW-YORK, stitute the judge for the triors was to call on him to decide
May, 1830. the challenge. It appears to me that we are required by the
The People authority of that case, and from the very nature of the issue,
v. it being an issue of fact, to say that the parties here have sub-
Mather. stituted the judge for the triors ; and we are to view the re-
jection of this juror as if it had been the result of their find-
ing. The challenge being for principal cause, went upon the
record ; the counsel for the people, if he had admitted the
facts on which it rested, would have been considered as hav-
ing demurred to it, but he did not admit them. He introdu-
ced evidence to shew that the facts were not such as the de-
fendant contended they were ; he must, therefore, be con-
sidered as taking issue on them by a plea. According to the
views of Mr. Justice Woodworth in the case of Vermilyea,
the regular course there would have been for the defendant
to state the fact on which he relied for cause, and then the
prosecutor would probably have elected to plead or demur.
Although, in point of fact, nothing was done in that cause
towards forming an issue on the record more than was done
in this, yet it was considered by the judge who allowed the
certiorari, and by the court after the cause came here, as if a
demurrer had actually been interposed to the challenge. It
seems to me to be a matter of course, that if the challenge for
principal cause goes on the record, it must be answered on
the record ; if demurred to, an issue of law is joined, and the
judge must decide it ; if the facts stated as the cause of chal-
lenge are controverted, an issue of fact is formed for the tri-
ors to pass upon. If neither of the parties ask for triors to
settle the issue of fact, and submit their evidence to the judge
and take his determination thereon, they cannot afterwards
object to his competence to decide that issue. The public
prosecutor in this case, by offering to shew that there was no
cause for principal challenge, and that the facts amounted at
most only to a challenge to the favor, is to be regarded as
putting in issue the facts on which the challenge rested. By
submitting his proof to the judge, without asking for triors, he
substituted him in their place ; we ought not, therefore, to
interfere with his decision, if we would not with a like deci-
sion of triors if the issue had been passed on by them. We

are then to enquire if the evidence would have warranted tri-

ors to find in favor of the challenge for principal cause.

All the cases referred to on the argument as bearing on this point were ably reviewed in *The People* v. *Vermilyea and others.* The conclusion to which the court arrived in that case is thus announced by the learned judge who delivered the opinion : " Upon the reason of the thing, the authority of adjudged cases, and the general understanding of the bench and bar, I have no doubt that the law is not chargeable with s ich injustice as to warrant the admission of a juror who, from a knowledge of the facts, or information derived from those who knew the facts shall have formed or expressed an opinion." It appears that the opinion of the challenged juror in that case had been made up on hearing witnesses testify on a former trial concerning the transaction upon which he was called upon to pass. In another part of the same opinion the judge says, " I apprehend that no adjudged case can be found in any of the courts of this country where a juror has been admitted who has formed or expressed a decided opinion on the merits of the case."

Every change of facts does not necessarily call for a mod- ification of a rule of law. However changed they may be, if the reasons for the rule remain it must be applied. Why is a juror who has formed and expressed an opinion upon the merits of a cause to be set aside in any case ? It is because he is supposed not to be indifferent to the result of the matter to be tried. Such an opinion in presumption of law is the effect of partiality or prejudice operating on his mind, perhaps without his consciousness.

We are asked in this case to distinguish between an opinion formed by being an eye witness of a transaction, or by hear- ing the testimony of those who were such witnesses, and an opinion founded on rumours, reports and newspaper publica- tions, and to say the former shall be evidence of partiality and the latter not.

If any distinction is to be recognized, I should be inclined to adopt the reverse of that contended for at bar. Shall a grand juror who has patiently listened to all the evidence on which an indictment is found, or one who witnessed the com-

mission of the offence be rejected when called on as a juror to try the accused ; and shall another be received without exception, who has formed his opinion on idle rumors and unauthenticated reports ? Of those who entertain an opinion of the guilt of the accused before his trial, they that believe on the slightest evidence, or no evidence at all, manifest, in my judgment, a state of mind less prepared to receive and allow a fair defence than those who believe on proof which furnishes *prima facie* evidence of guilt.

The ancient rule of law on this subject was, I apprehend, the very reverse of that now contended for, and I think was founded on better reasons. *Hawkins* says that it is a good cause of challenge on the part of the prisoner, that the juror hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like ; but he adds, if the juror made such declaration upon his knowledge of the cause, but not out of ill-will, it is no cause of challenge. (*Hawk. B. 2, ch.* 43, § 28.) If a juror says that he will pass for one party because he knows the verity of the matter, it was formerly no cause of challenge. (1 *Trial, per pais,* 189.) It is now conceded, and such were the decisions in the cases of *Van Alstyne* and *Vermilyea,* that if the opinion of the juror be founded on a knowledge of the facts, or on information derived immediately from those acquainted therewith, it constitutes a good objection to him. If in any case it would be safe to admit a juryman who had formed and expressed an opinion, the presumption of fairness and impartiality would certainly be stronger in favor of him who founds his belief on authenticated facts, than of him who has given credence to vague and groundless rumors. The remarks of Ch. J. Marshall in the trial of Burr, (*Burr's Trial,* 1 *vol.* 370,) are, in my opinion, very judicious. If it be said, he observes, that the juror has made up his opinion, but has not heard the testimony, such an excuse only makes the case worse, for if the man have decided upon insufficient testimony, it manifests a bias that completely disqualifies him for the functions of a juryman.

The law, I apprehend, attaches the disqualification to the fact of forming and expressing an opinion, and does not look

beyond, to examine the occasion or weigh the evidence on
which that opinion is founded. Such certainly were the
views of the court in the case of Burr. (1 Burr's Trial,
419.) The cases of *Blake* v. *Millspaugh*, (1 Johns. R. 316,)
and *Pringle* v. *Huse*, (1 Cowen, 432,) contain a similar doc-
trine.

There is, however, a distinction between positive and hy-
pothetical opinions. It was recognized in the case of *Dur-
ell* v. *Mosher*, (8 Johns. R. 405.) The court in that case
say that the juror had given no decided opinion on the mer-
its; his declaration was hypothetical. The case of *The
People* v. *Van Alstyne*, referred to by Mr. Justice Wood-
worth, (6 Cowen 565,) was considered, on the argument by
the counsel for the people, as a strong authority on this
point. The late Ch. J. Spencer decided in that case, that if
the opinions of the jurors were formed on mere rumors and
reports, such opinions did not disqualify them. It appears
to me enough is not said as to the particular character of
those opinions, to enable us to determine the true point of
that decision. After stating the case of Van Alstyne, along
with that of *Coleman* v. *Hagerman*, (both of which were
manuscript opinions received from the late Ch. J. Spencer,)
Mr. Justice Woodworth remarks, that the principle upon
which these cases were decided is, that an opinion formed
and expressed by a juror is of itself evidence that he does
not stand indifferent between the parties. If the case of
Van Alstyne is to be understood as it was put to us on the
argument, the deduction from it by the learned judge is al-
most the reverse of what it should have been. The counsel
for the people understands that case to have been decided on
the principle that an opinion formed and expressed by a ju-
ror is *not* of itself evidence that he does not stand indifferent,
unless he has formed it from a knowledge of the facts at-
tending the offence charged, or on the information of those
who were acquainted with those facts. The statement of
the case of *Coleman* v. *Hagerman* came from the late chief
justice with that of Van Alstyne, and was intended to pre-
sent a similar principle of law. They must be reconciled;
but that cannot be done if the opinions of the jurors in the

NEW-YORK,
May, 1830.

The People
v.
Mather.

case of Van Alstyne were more than hypothetical, or at most, slight impressions. A motion it seems was made for a new trial, in the case of *Coleman* v. *Hagerman*, on the ground that Graham, one of the jurors, had used language indicating an opinion that the defendant ought to be exemplarily punished. It appeared that this juror was wholly unacquainted with the parties till after the trial, and that the opinions expressed by him were founded on *newspaper publications.* The juror swore that he had no bias or partiality for either party, and personally knew nothing of the assault and battery complained of; yet the court unanimously awarded a new trial, on the ground that the juror did not stand indifferent in consequence of the opinions he had expressed. It would require considerable ingenuity to shew any features in the situation of Graham to distinguish it from that of Martin. Martin founded his opinion on printed statements in newspapers and reports in conversation. Graham received his from newspaper publications. He was wholly unacquainted with the parties, knew nothing of the assault and battery, and solemnly deposed that he had no bias or partiality towards either party. Martin had heard nothing directly from the mouth of any of the witnesses to Morgan's abduction. In his own opinion he had no bias; for though, if the circumstances he had heard should be supported by proof, he had a fixed opinion of the defendant's guilt; yet, if they should be done away, he should not consider him guilty; if they should not be proved, his present belief would be removed. This part of the witness' account of the state of his mind is not remarkably perspicuous, yet if I do not misapprehend it, he means to convey the idea that he had a belief of the defendant's guilt, which was to be removed. Certainly it cannot be pressed beyond the point to which Graham went, to do away the objection to him, when he deposed that he had no bias against, or partiality for either party. The authority of the case of *Coleman* v. *Hagerman*, well warrants the decision of the judge against the admissibility of Martin. Too much stress ought not to be laid on the juror's declaration, that if the circumstances on which his opinion was founded should not be supported by the evidence

his opinion of the defendant's guilt would be removed.   The <span style="float:right">NEW-YORK,</span>
disqualifying bias which the law regards, is one which in a <span style="float:right">May, 1830.</span>
measure operates unconsciously on the juryman, and leads <span style="float:right">The People</span>
him to indulge his own feelings when he thinks he is influ- <span style="float:right">v.</span>
enced entirely by the weight of evidence.   (1 Chit. Cr. L. <span style="float:right">Mather.</span>
443.   Bac. Abr. tit. Juries, E. 5.)   If he is sincerely de-
termined to discard his prejudices, he is not to be received,
because the law does not hold him capable of doing so.   " He
will listen," as Ch. J. Marshall has correctly observed, " with
more favor to that testimony which confirms than to that
which would change his opinion.   It is not to be expected
that he would weigh evidence or argument as fairly as a man
whose judgment is not made up in the case."

I have taken another view of this case on this point, which
has brought me to the same conclusion.   The issue on the
challenge, as has been before remarked, was an issue of
fact; and by the implied assent of the parties, the judge took
the place of the triors.   If it should be conceded that his
opinion was against the weight of evidence, his error or mis-
take would not furnish good ground for granting this mo-
tion.   It is a well established principle of law, that if the ju-
ry, on the main issue in a criminal cause, find against evi-
dence that the defendant is not guilty, there cannot be a new
trial; and to grant a new trial because the triors, or the judge
acting in their stead, have not correctly weighed the facts in-
volved in a collateral issue, would be a proceeding in utter
disregard of that principle.   I am therefore of opinion that
the exception to the decision of the judge setting aside Mar-
tin, a juror challenged by the defendant, is not sustainable.

If I have not misapprehended the law applicable to the
point I have considered, the charge of the judge to the tri-
ors of Clark, a juror challenged for favour, was unexception-
able, and their decision well warranted by the evidence.

It was agreed by the counsel for both parties that the
*talesmen* should be treated as if challenged by each side, and
that the evidence given should be considered as demurred
to.   The duty of passing on the jurors consequently devolv-
ed on the judge, but the right of excepting to his decision in
any case was mutually reserved.   Ashley, a juror who was

examined under this agreement, shewed what was sufficient, in my opinion, to sustain an objection to him, if urged by the defendant; but the challenge on his part was withdrawn. The counsel for the people insisted that, under the agreement, the only inquiry was, whether the juror stood indifferent between the parties. The judge decided that although the evidence shewed a bias against the defendant, he might waive the objection, and the other party could not insist upon it. There is no good reason, I think, to impeach the soundness of this opinion. It was competent for either party to forego any advantage which, by the terms of the agreement, he had secured to himself. It would be strange indeed if the rights that one party had under this agreement were not left to his own discretion, to be used or not as should be seen fit, but must be enforced at the suggestion of the other party. The agreement, by no fair construction, could give to the prosecutor a right to insist on a challenge that, without such agreement, could legally come only from the defendant. It is also contended, on the part of the people, that the decision of the judge in relation to this juror was against the weight of evidence. The only direct evidence that had a tendency to raise a presumption of partiality in favor of the defendant was, that the juror, who was destitute of property, was a partner of James Mather, the defendant's brother, who was a wealthy man and furnished the capital used in their business. I have seen no case where a juror has been set aside on such slight grounds. In the course of his examination, Ashley testified to a fact that may well be thought improbable, but we cannot say that it was untrue. He had resided 18 months or more previous to the trial with James Mather, and yet he said the abduction of Morgan had not been the subject of conversation. If it would be reasonable to indulge a suspicion as to the correctness of this statement, still we look in vain for positive evidence sufficiently cogent to justify our interference with the decision of the judge by setting aside this juror. But even if there was error here, it was upon a question of fact. The judge was in the place of the triors, and it would be against the principle before mentioned to grant a new trial on that ac-

count in a criminal case, where there has been a verdict of acquittal.

After Benjamin Wright, a witness called in behalf of the prosecution, had detailed with considerable particularity a conversation with the defendant about the abduction of *Morgan*, he said he had given all the conversation on the occasion referred to, which he could recollect in words or in substance. The public prosecutor then proposed to ask the witness, *whether or not he in substance or effect addressed the defendant as one of those concerned in the transaction.* This question was objected to and overruled. The question was then varied, and the witness was asked *how he addressed the defendant in respect to his being one of the persons concerned.* This question was also objected to and overruled. To each of these decisions an exception was taken. Considerable discretion is left to a judge who presides at a trial to regulate and control the examination of witnesses, and this court are cautious to avoid encroaching upon the proper exercise of this discretion. If, however, an established rule of law has been violated, the party injured has an undoubted right to relief, and the court feel no reluctance in such a case to grant it.

It is a mistake to suppose that such only is a leading question, to which *yes* or *no* would be a conclusive answer. A question is leading which puts into a witness' mouth the words that are to be echoed back, or plainly suggest the answer which the party wishes to get from him. (1 Stark. Ev. 124.) It is often a matter of extreme difficulty to distinguish such questions as ought not to be tolerated because they are leading, from those which, though in their form leading, are in effect only calculated to draw the mind of the witness to the subject of inquiry.

In passing on these questions, the court are to regard in some measure the inclinations of the witnesses as well as the subject matter to which the question relates. If it is apparent that the witness is in the interest of the adverse party, the court will be justified in going so far as to permit the direct examination to take the character of a cross-examination. If the question relate to introductory matter, and be designed to lead the witness with the more expedition *to*

what is material to the issue, it is captious to object to it, even if it be leading. The pernicious influence of leading questions is most felt and to be feared when the object of inquiry is, to ascertain the details of a conversation, admission or agreement; and therefore more rigor is called for and justified in confining the direct examination in such cases to its appropriate rules. There is an essential difference between a direct examination and a cross-examination; and the court ought not, except in peculiar cases, to permit the former to assume the character of the latter. The grounds on which the judge proceeded in overruling the questions proposed to be put to the witness *Wright*, must have been, I presume, that they were leading, or that the party by whom he was called were subjecting him to a cross-examination. It is quite evident that the witness' memory as to the conversation was exhausted before those questions were proposed. The first appears to me to be a leading question. I consider it no more nor less than asking the witness if he addressed the defendant as one of the abductors of Morgan. This seems to me to be very similar to asking a witness, after he had testified to all he knew as to the contents of a letter, if it had in it any thing about the writer being offered a certain price for a special article of merchandize. Such a question is admitted by Lord Ellenborough to be a leading one. (*Courteen* v. *Touse*, 1 Campb. 43.) The question in that case was allowed to be put to the witness by the party calling him, but it was for a particular reason which does not exist in this case. If the question put to Wright had been in the direct instead of the alternative form, it would clearly have been exceptionable ; but by putting it in the alternative, the effect of it was not changed. As it was, it plainly suggested to the witness the answer which the party wished to get from him. It therefore conformed to the very definition of a leading question.

After the question was overruled it was varied, and so varied I think as to assume the fact as true, which it was the object of the question to prove. It assumed that the witness did address the defendant as one of the persons concerned in carrying off Morgan, and only asked him to tell the man-

ner of the address.   In this respect I hold the second ques-
tion objectionable.   Even on cross-examination it is not al-
lowable to put a question which assumes a fact proved which
is not.   (1 Stark. Ev. 133.)

If I had serious doubts as to the correctness of the judges'
decisions on these questions I should feel inclined to hesitate
before granting a new trial.   There should be a reasonable
expectation that something will be gained by a further ex-
amination of the witness ; such an expectation can scarcely
be indulged here.   It is conceded that the witness in this
case was intelligent, and it was not pretended that he man-
ifested the least reluctance to disclose whatever he knew ;
his memory was exhausted as to the details of his conversa-
tion with the defendant, so much so that he declared he had
stated in words or in substance all he could recollect.   The
experiment of submitting such a witness to a sifting cross-ex-
amination holds out but a faint hope that more truth would
be elicited from him ; but the right thus to examine him does
not exist in this instance.

The public prosecutor objected to the right of the defend-
ant to call and re-examine this witness in relation to the same
subject on which he had been examined more than twenty-
four hours before, and after several other witnesses had been
called and examined subsequent to his first examination.
When the examination is closed and the witness dismissed
from the stand, it is a matter resting in the discretion of the
court which receives the testimony, to allow of a further ex-
amination.   I do not doubt that this discretion is often too
indulgently exercised, but it is scarcely possible for this court
to regulate it.   Courts which try issues of fact must experi-
ence the inconveniences arising from too great indulgence in
this respect, and on them devolves the duty of applying the
corrective.   At all events it is a matter too purely discre-
tionary to warrant the interference of this court, unless it
should be in a very flagrant and oppressive instance.   The
case now presented to our consideration is not of that char-
acter.

In examining the various grounds on which this motion for a new trial is placed, I am brought to the consideration of the judges' decision excusing Daniels, a witness on the part of the prosecution, from answering the question put to him, on his allegation that the answers might expose him to infamy, or implicate him in the transaction relative to William Morgan.  A distinction is to be taken as to the rule of law between a question, the direct answer to which may fix a stain of infamy on the character of the witness, and a question the answer to which may have a tendency to implicate the witness in a criminal charge for which he may be prosecuted. The rule applicable to the first question as laid down by Mr. Peake is, that a witness shall not be rendered infamous or even disgraced by his own examination as to facts not connected with the cause in which he is examined. (Peake Ev. 202.) In some of the elementary treatises on evidence the rule is not qualified by the last clause; but in all the cases I have seen the question, the answer to which might, as it was alleged, disgrace the witness or render him infamous, did not relate to a matter directly connected with the merits of the cause. (4 Esp. 226.  13 Johns. R. 82.  1 Phil. on Ev. 207.  1 Starkie Ev. 137.) The object of the interrogatory was to impair the credibility of the witness.

If a witness is allowed to decline answering when examined for one purpose, because the answer may shew him infamous, perhaps it may be a refinement to hold that he is debarred the same privilege when exposed to the same result because the question is material to the merits of the cause. If the objection to answer be placed, as it undoubtedly is, on the ground that the witness may be disgraced thereby, his privilege attaches when that result will be produced by the answer. It is not reasonable that the right to this privilege should depend on the bearing of the testimony or any other matter.  But where the privilege arises from an apprehension that the answer will expose the character of the witness to the reproach of moral turpitude, as distinguished from the danger of a criminal prosecution, it is not enough for the witness to allege that his answer *will have a tendency* to expose him to infamy or disgrace. The question must be such

that the answer to it, which he may be required by the obligation of his oath to give, will directly shew the infamy and the court must see that such will be the case before they will allow the excuse to prevail. No direct answer that Daniels could have given to the questions put to him could have fixed on him the stain of infamy. The first question put to him was, whether he was at a particular house on a particular day; a day when Morgan, as it was alleged, was brought there. The second question was, whether a hack or covered carriage was driven to or arrived at that house on the evening of that day. Whatever answer he might give to these questions, no infamy or disgrace could thereby attach to him as the immediate result of the answer. Whether the rule be as laid down by Mr. Peake, or more general and extensive it its operation, no excuse to exonerate the witness from answering these questions could be drawn from it.

It may be urged in behalf of a witness, and I think it was so put to us on the argument in this case, that if the answer to the question, provided the witness was still liable to a criminal prosecution, would supply a link in the chain of testimony which might be the only one undiscovered and wanted, to sustain a criminal proceeding against him, it might, though exempt from a prosecution, supply one of the facts by which the infamy of being concerned in a criminal transaction would be established and publicly proclaimed to the world. Inquisitive curiosity may go as far in bringing together scattered facts to trace out offenders as a judicial investigation, but the law will not look upon what may or may not be done as private feelings shall dictate, as it views what it commands to be done. It will not presume that an investigation will be carried through a series of transactions, in order to develope the infamy of an individual where there is no obligation of duty to do so; but it will presume, where a fact is disclosed which will contribute to a conviction of an offender, that the officers to whom is committed the administration of justice will use that fact in the detection of guilt. The distinction which I have endeavored to point out between the rule which protects the witness from being compelled to proclaim his own infamy, and that which secures

him when on the stand from becoming the unwilling instrument of his own conviction, is not new or unsupported by authority. In *Macbridge* v. *Mackbridge*, (4 Esp. Rep. 242,) the defendant proposed to ask one of the witnesses if she did not live in a state of concubinage with the plaintiff. Lord Alvanley interposed and prevented the putting of the question. He observed, " I do not go so far as others may, I will not say that a witness shall not be asked what *may tend* to disparage him. I think those questions only should not be asked which have a direct and immediate effect to disgrace or disparage the witness." It was said by Lord Eldon, (1 Merivale, 400,) " Upon the question of character I hold, that supposing a man to be liable to a penalty of forfeiture, provided he is sued within a limited time and that the suit is not commenced till after the limitation expires, he is bound to answer fully, notwithstanding his answer *may tend* to cast a very great degree of reflection upon his character and conduct."

A more restricted signification was given by the defendant's counsel on the argument to the word *criminate* than the cases warrant. In them, the expression that a witness cannot be compelled to answer a question that criminates or has a tendency to criminate himself, means, that he is not required to answer a question if by so doing he must disclose what will shew or has a tendency to shew that he is guilty of a crime for which he is yet liable to be punished. So it was used in the case of Burr, (Burr's Trial, 424,) in *Cates* v. *Hardazes*, (3 Taunt. 424,) and in *Parkhurst* v. *Lawton*, (2 Swanston, 215.)

The principal reliance of the defendant to sustain the determination of the judge, is placed, I presume, on the rule of law that protects a witness in refusing to answer a question which will have a tendency to accuse him of a crime or misdemeanor. Where the disclosures he may make can be used against him to procure his conviction for a criminal offence, or to charge him with penalties and forfeitures, he may stop in answering before he arrived at the question, the answer to which may show directly his moral turpitude. The witness who knows what the court does not know, and what

he cannot communicate without being a self accuser, is to judge of the effect of his answer, and if it proves a link in the chain of testimony, which is sufficient to convict him, when the others are made known, of a crime, he is protected by law from answering the question. If there be a series of questions, the answer to all of which would establish his criminalty, the party connot pick out a particular one and say, if that be put the answer will not criminate him. " If it is one step having a tendency to criminate him, he is not compelled to answer." (16 *Vesey*, 242.) The same privilege that is allowed to a witness, is the right of a defendant in a court of equity when called on to answer. In *Parkhurst* v. *Lawton*, before referred to, the chancellor held that the defendant " was not bound to answer the question, the answer to which would criminate him directly, but not any which, however remotely connected with the fact, would have a tendency to prove him guilty of simony." The language of Ch. J. Marshall on Burr's trial is equally explicit on this point. " Many links," he says, " frequently compose that chain of testimony which is necessary to convict an individual of a crime." It appears to the court to be the true sense of the rule, that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case, that a witness by disclosing a single fact may complete the testimony against himself, and, to every effectual purpose, accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself would be unavailing, but allother facts without it would be insufficent. While that remains concealed in his own bosom he his safe ; but draw it from thence and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself, would most obviously be infringed by compelling a witness to disclose a fact of this discription." (1 *Burr's Trial*, 244.)

The object of the two rules I have been considering is very different. The one saves the witness from being the herald of his own infamy ; the other from himself furnishing the means of his punishment. The confounding of these rules would in my opinion produce a strange result. Would it be

pretended that a man who had been convicted and punished for a particular offence and was called as a witness against an accomplice, would be excused from testifying to any of the series of facts in which he had participated with the accused, the proof of which constituted the evidence by which his guilt was made manifest, because his answer has a tendency to show that he had committed the offence? There could be nothing in the situation of such a witness or in that of any other witness who could not be exposed to a prosecution, which requires the application of a rule of law designed to protect men from becoming instrumental in bringing down upon themselves the penalties of violated laws.

My conclusion is that where a witness claims to be excused from answering a question because the answer may disgrace him or render him infamous, the court must see that the answer may, without the intervention of other facts, fix on him moral turpitude. Where he claims to be excused from answering because his answer will have a *tendency* to implicate him in a crime or misdemeanor, or will expose him to a penalty or forfeiture, then the court are to determine whether the answer he may give to the question can criminate him directly or indirectly, by furnishing direct evidence of his guilt, or by establishing one of many facts, which together, may constitute a chain of testimony sufficient to warrant his conviction, but which one fact of itself could not produce such result ; and if they think the answer *may* in any way criminate him, they must allow his privilege, without exacting from him to explain how he would be criminated by the answer which the truth may oblige him to give. If the witness was obliged to show how the effect is produced, the protections would at once be annihilated. The means which he would be in that case compelled to use to obtain protection, would involve the surrender of the very object for the security of which the protection was sought. I am therefore of opinion that Daniels should have been required to answer the questions put to him, unless the answers might have had a tendency to implicate him in a criminal offence for which he was then liable to be prosecuted.

Daniels could not have been indicted for conspiring to carry off or to imprison Morgan, nor for committing an assault and battery on him, because the statute of limitations furnished a bar to the proceedings. Suppose a more disastrous fate attended Morgan than has yet been brought to light: suppose he was murdered—a catastrophe far from being too improbable at this time to be assumed as a ground for reasoning, or illustration of an argument—all those who were engaged in his abduction would be implicated in that murder, those who were present at its consummation as principals, and all others as accessaries before the fact. Would their offence be barred by the statute of limitations? All suits, informations and indictments for any crime or misdemeanor, *murder excepted*, must be prosecuted within three years after the offence is committed. (1 R. L. 187.) It is contended, on the part of the people, that this exception is to be rigidly construed, and should be taken to include only the offence of principals to a murder, and not accessaries before the fact. Whatever is murder is included in it. If the crime of an accessary to a murder before the fact is not a murder, it is without a specific name. Homicide is a generic term, within which the offence of an accessary to a murder must fall; but I have never seen an enumeration of the several species of offences included in it which will embrace this crime, if it be any thing different from murder. It can be neither manslaughter nor excusable or justifiable homicide.

By the act concerning murder, (1 R. L. 66,) all wilful killing by poisoning is declared wilful murder of malice prepense, and the offenders therein, their aiders, abettors, procurers and counsellors are to suffer death, and forfeit in every behalf, as in other cases of wilful murder of malice prepense. In the act declaring the punishment of certain crimes, it is provided that every person convicted or attainted of any kind of murder, or of aiding, abetting or procuring any kind of murder to be committed, shall suffer death for the same, (1 R. L. 407.) Principal and accessaries are grouped together in these statutes without any distinction as to their punishment or the nature of their offence. It is beyond a doubt that in the Revised Statutes the offence of an accessa-

NEW-YORK,
May, 1830.

The People
v.
Mather.

ry to a murder before the fact comes under the denomination of murder. They speak of no such offence as distinct from it. The killing of a human being by the act, procurement or omission of another, in cases where such killing shall not be murder according to Title 1 of Chap. 1, concerning crimes and punishments, is declared to be justifiable or excusable homicide or manslaughter, (2 R. S. 660.) What· is justifiable or excusable homicide, and what is manslaughter, is there defined, and so defined as to exclude the idea that the crime of an accessary to a murder before the fact can be any thing else but murder. Writers on criminal law make some difference between the offence of a principal and that of an accessary, but this is chiefly as to the order and mode of proceeding against them. Ordinarily the accessary cannot be convicted before the principal. They may, however, be joined together in the same indictment, and tried at the same time ; and this mode of procedure is recommended by Mr. Justice Foster as the most eligible. (Foster, 365.) It seems to be settled that if a person be indicted as principal and acquitted, he cannot be again indicted as an accessary before the fact. (1 Hale's P. C. 626. 2 Hawk. 244. 1 Russell on Crimes, 51.) This must proceed on the ground that the second indictment is for the same offence contained in the first. (Kel. 25, 6.) Mr. Justice Foster, however, does not so view it. He is of opinion that the offence of the principal and accessary *specifically* differ ; they may specifically differ and yet both be murder. Murder by poisoning is different from that by shooting, and, as we have seen, the statute implies that there are several kinds of this crime. Neither the statute nor common law has attempted to characterize the offence of an accessary by a specific name different from that which is applied to the crime of the principal, or to distinguish him in punishment from the doom that awaits the principal. There is no settled grade of enormity between them. He who conceives the mischief and sets the assassin to work is as wicked and deserves as much severity from the law as he that stricks the fatal blow. It is incontrovertible that he who procures a felony to be committed is a felon, and if the felony be a murder he is a murderer. I cannot find in the

statute of limitations any thing from which I can infer that
the legislature intended that any length of time should place
an accessary to a murder before the fact beyond the reach of
punishment.

If I am correct in my conclusion that the offence of acces-
saries to a murder before the fact is not included within the
statute of limitations, it is certainly not improbable that the
witness Daniels might have had a fair claim to the privilege
he asserted and the court yielded to him. After what
took place at the trial, it is not illiberal to suppose that
Daniels was involved in the transaction to which the de-
fendant was supposed to be a party. The mysterious
obscurity that hangs over the termination of this affair jus-
tifies a well founded suspicion that Morgan came to an un-
timely end. If this conjecture is well warranted, (and whether
it is so or not the witness may know, but cannot be required
to explain,) the court must see that his privilege to decline an-
swering is as likely to exist now as at any period before the
statute attached to the minor offences of conspiracy and false
imprisonment. I think the judge could not safely say that
the privilege was claimed by the witness in this case as a mere
subterfuge to suppress the truth, and thereby aid the escape
of the guilty.

The judge properly refused to permit the enquiries which
the public prosecutor proposed to make for the purpose of
sustaining the character of Gregory, a witness called on the
part of the people. Several persons had testified to his bad
character. It was then proposed, by way of supporting his
credit, to introduce witnesses to shew that the reports against
him had originated from a particular party or body of men, and
were founded on a particular transaction, which had been in-
tentionally perverted to injure his character. I think this
was asking for a greater latitude of enquiry than it would be
safe to grant. If the main issue formed by the pleadings is
to be tried with reasonable expedition, collateral issues must
be avoided as much as possible. These issues are more like-
ly to multiply in ascertaining the interest or testing the credi-
bility of witnesses, than in any other incidents of a trial.
The rule which, every thing considered, has been found saf-
est on this subject is, to allow general evidence to be given of

general character. Starkie says, that the proper question to be put to a witness who is called to impeach another is, *whether he would believe him on oath.* (1 Stark. on Ev. 147.) Phillips states that the mode of inquiry is to ask the witnesses *whether they have the means of knowing the general character of the former witness, and whether, from such knowledge, they would believe him on oath.* (1 Phil. Ev. 212.) When general evidence of this nature is given, impeaching the credit of a witness, the opposite party may go into a cross-examination to ascertain the grounds of the unfavorable opinions, and in doing that he may interrogate the witnesses as to their opportunities of knowing the character of the impeached witness, how long and how generally the unfavorable reports have prevailed, and from what particular individuals they heard them. This range of cross-examination would seem to be sufficient to enable the party calling the impeached witness to shew, if such was the fact, that the imputed bad character was artificial, and created to answer a particular purpose. To authorize further enquiries would very much embarrass and delay trials, and probably, in no respect, subserve the ends of justice. If the public prosecutor had been permitted in this case to introduce evidence to shew that the reports originated with a particular party or body of men, the defendant must have been allowed to controvert the fact by the testimony of other witnesses. If it was allowable for one party to shew that the bad character arose from a particular transaction which did not justify the disparaging reports, the other party must be allowed to shew that the nature of that transaction was such as to warrant them. It was the duty of the judge to exclude these collateral enquiries.

It is contended that the judge erred in instructing the jury that to convict the defendant they must be satisfied that he was a party to the conspiracy at its formation originally, and that his rendering assistance in carrying it into execution, after it was formed, would not make him a party to it.

The proof established a conspiracy in or about Canandaigua to take Morgan from the jail at that place, and to carry him away. There was no evidence to shew that the defendant was then a party to it. His first visible connection with those who commenced the illegal act, if he was at all con-

nected with them, was after Morgan had been removed seventy miles from Canandaigua.

The language of the charge warrants the belief that the judge thought there was but one conspiracy proved. There is no proposition better established than that the venue in a criminal case must be laid in the county where the offence was committed. In indictments for conspiracy, the venue may be laid in any county in which it can be proved that an *overt act* was done by any one of the conspirators in furtherance of their common design. (Archb. Crim. P. 6.) Where a conspiracy was formed at sea, and an overt act done in the county of Middlesex, it was held that the venue was properly in *that county*. (*The King* v. *Bresac* & Scott, 4 East, 164.) So in the case of *The King* v. *Bowes and others*, referred to in *The King* v. *Bresac* & Scott, the conspirators were tried in Middlesex, though there was no proof of an actual conspiracy within that county, and the acts and doings of some of them were wholly in other counties. All these cases must proceed, I think, on the principle that the crime is committed where the overt act is performed. I admit that it is the illegal agreement that constitutes the crime; when that is concluded the crime is perfect, and the conspirators may be convicted if the crime can be proved. No overt act need be shewn or even performed to authorize a conviction. If conspirators enter into the illegal agreement in one county, the crime is perpetrated there, and they may be immediately prosecuted; but the proceedings against them must be in that county. If they go into another county to execute their plans of mischief, and there commit an overt act, they may be punished in the latter county without any evidence of an express renewal of their agreement. The law considers that wherever they act, there they renew, or, perhaps, to speak more properly, they continue their agreement, and this agreement is renewed or continued as to all whenever any one of them does an act in furtherance of their common design. In this respect conspiracy resembles treason in England, when directed against the life of the king. The crime consists in imagining the death of the king. In contemplation of law, the crime is committed wherever the

NEW-YORK, traitor is, and furnishes proof of his wicked intention by the
May, 1830. exhibition of any overt act.

The People        If the proposition which I have stated relative to conspir-
v.         ators be correct, (and there is no accounting for the decis-
Mather.     ions on the subject unless it be upon the principal I have
mentioned,) it necessarily follows that whenever a new par-
ty concurs in the plans originally formed, and comes in to aid
in the execution of them, he is from that moment a fellow
conspirator. He commits the offence whenever he agrees
to become a party to the transactions, or does any act in fur-
therance of the original design.

If this conclusion is properly deduced from the authorities
referred to, the judge erred in saying to the jury that al-
though it should satisfactorily appear that the defendant as-
sisted in carrying the conspiracy into execution after its for-
mation, that fact would not make him a party to it. This
doctrine of the judge would seem to render it impossible for
a new party to be added to the original conspirators. Can
it be true, that if two men conspire to commit a criminal act,
and afterwards twenty others co-operate with them in exe-
cuting the plan, these last are not conspirators? If a series
of acts are to be performed with a view to produce a partic-
ular result, he who aids in the performance of any one of
these acts in order to bring about the result, must have the
intention to effectuate the end proposed; and if he operates
with others, knowing them to have the same design, there is
in fact an agreement between him and them; his criminal
intent is not to be distinguished from the intent of those who
first formed the plans of the conspiracy. If two thirds of
the journeymen of any particular mechanic art in a city
should agree to turn out for higher wages, and after the
agreement was formed the other third should join them,
would those who last acceded to the design be less exposed
to the penalties of the law than those who originated it?
Would not their concurrence, without any particular proof
of an agreement to concur, be conclusive against them? If
it had been proved that the defendant in this case had met
persons in Orleans county who had Morgan in their custo-
dy, and on being made acquainted with their views had ex-

pressed his approbation of their original undertaking, and given them his aid in accomplishing it, would he not have been involved in the conspiracy? I cannot bring my mind to entertain a doubt on the subject. But it may be said that the case supposed shews a new conspiracy. I concede that it does; but it shews a new conspiracy no more than one would be shewn by proving that the defendant assisted in carrying the conspiracy into execution after it was formed. It may be that the judge only meant to say, that the acts of the defendant being merely in furtherance of the design of the conspirators, would not make him a party to the conspiracy. They certainly would not, unless he knew of the designs of the conspirators, and intentionally lent his aid to them. It is settled on good authority that the fact of conspiring need not be proved. (2 Day's Rep. 205. 1 Wm. Black. Rep. 392.) If parties concur in doing the act, although they were not previously acquainted with each other, it is a conspiracy. (Per Lord Mansfield, 1 Hawk. chap. 72, sect. 2, note.) Lord Kenyon says, in *The King* v. *Hammond & Webb*, (2 Esp. Cas. 719.) "If a general conspiracy exists, you may go into general evidence of its nature and the conduct of its members, so as to implicate men who stand charged with acting upon the terms of it, years after those terms have been established, and who reside at a great distance from the place where the general plan is carried on." These cases shew that all who accede to a conspiracy after its formation and while it is being executed, become conspirators. I am of opinion that the judge misdirected the jury as to the law, when he stated to them that the defendant, if he was not a party at the formation of the conspiracy originally, would not become such by assisting to carry it into execution.

But under the circumstances of this case, I entertain serious doubts whether the court ought, (assuming that it has the right,) to grant a new trial for this misdirection. In ordinary cases the court do not grant a new trial if the judge has misstated the law to the jury, unless it is probable that the result of the trial has been thereby changed. In criminal cases, where the defendant has once been acquitted, the re-

luctance to grant new trials has ever been very great. It is a conceded rule of law, not to grant a new trial in such cases because the verdict is against evidence. Whether a new trial can be granted where there has been an acquittal without infringing the rights of the defendant, even where the court have misdirected the jury, is now an unsettled question. If the power exists it ought not to be exercised, unless it is reasonable to infer that the misdirection of the court has been the cause of the acquittal. Was the verdict of acquittal in this case the result of the judge's error as to the law? I do not believe that we should be warranted in saying that it was. I do not, however, mean to be understood, that I approve of the verdict of the jury. This court look at the facts only with a view to ascertain and settle the questions of law that arise in the case.

There is no complaint of the judge's charge, so far as it related to the count for the false imprisonment. On that count the jury acquitted the defendant. If they did not think the evidence sufficient to convict him of falsely imprisoning Morgan, they could not, consistently, on the same evidence convict him of conspiring to imprison him. The conspiracy, so far as it could affect the defendant, was made out by the proof of acts as distinguished from an agreement: and if they were not sufficient to establish the charge of a false imprisonment, they were insufficient to establish that of a conspiracy. The evidence relied on to convict the defendant was, that he drove a carriage which, it was supposed, contained Morgan, knowing that he was in it, and detained there against his will. If the testimony did not establish that fact, there was not sufficient proof to warrant a conviction for a conspiracy, and the jury by acquitting the defendant of the charge of false imprisonment, have said that fact was not established. Considering the character of the evidence given, the acquittal on the count for the false imprisonment necessarily involved the acquittal on that for a conspiracy under proper instructions as to the law applicable to the latter charge. I cannot, therefore, persuade myself that the error of the judge contributed to the acquittal of the defendant, and I am against granting a new trial on that account.

NEW-YORK,
May, 1830.

The People
v.
Mather.

Something was said on the argument in favor of granting a new trial because the verdict was against evidence, but this point was properly yielded by the counsel for the people. The law is well settled, as I have had occasion in the course of this opinion to remark, that a new trial cannot be granted where there has been an acquittal because the verdict is against evidence. I have now disposed of the points made on behalf of the motion for a new trial.

There were other views presented to us by the defendant's counsel, and fully argued on both sides, on which it was expected that the court would express an opinion. The conclusion to which I have arrived in examining the grounds of the motion for a new trial does not render it necessary that any other point should be considered; but as there are several other causes to be tried in which it is highly probable that the questions raised by the defendant here will arise, it may be desirable in relation to them that the court should express an opinion on the other points made in this cause. In doing this we are not anticipating questions. The points we are about to examine were not only raised in this case, but fully and ably argued under a belief that it would be necessary to pass on them in deciding the present motion.

It is insisted that the indictment in this case is insufficient because it does not contain a particular specification of the crime, and does not set forth the overt acts relied on as evidence to manifest the defendant's guilt. The first count charges the defendant with having conspired and combined, &c. at Gaines, in the county of Orleans, with divers persons unknown, unlawfully to harrass, vex, oppress, assault, and falsely imprison one William Morgan, &c. The decision in *Lambert's case*, (9 Cowen, 578,) was, that if an indictment for a conspiracy does not set forth the object specifically, and show that such object is a legal crime, it should state particularly the means intended to be used by the conspirators, and shew that those means are criminal. This rule has not, though the defendant's counsel supposed it had, a particular application to the case before us, because this indictment sets for a legal crime as the object of the conspiracy, the false imprisonment of a citizen. The crime explicitly ap-

pears. In relation to stating overt acts in the indictment, I apprehend the counsel for the defendant has been misled as to the law by assimilating conspiracy to treason. In several respects there is an analogy between them, but the necessity of setting forth overt acts in an indictment for treason arises from statutory provisions which were not made, as I conceive, in affirmance of the common law. The offence in treason is an act of the mind, but as it could be proved only by external acts, there was much reason for requiring, (as several acts of parliament have done,) some of those acts to be stated. This is a deviation from the common rule in pleading, which requires the crime or cause of action to be stated, and not the evidence by which it is to be proved. The compassing the death of the king is the treason; the overt acts are the means made use of to effectuate the intentions or imaginations of the heart. The overt acts, as they are the only things that can be proved, are the charges to which the accused has to answer. (Foster, 194.) No person can be convicted of treason against whom an overt act cannot be proved, but this is not the case in conspiracy; it is not a mental offence; it does not consist in intents and imaginations. It exists where there are no overt acts other than the agreement. I have alluded already to several authorities which declare that conspirators may be convicted if no act has been done towards the accomplishment of their designs. This certainly could not be the case if an overt act must be set forth in the indictment. Mr. Chitty says, it is usual to frame the indictment stating the conspiracy, and then shewing that in pursuance of it certain overt acts were done, but it is holden sufficient to state the conspiracy alone. (3 Chit. C. L. 909. 2 Lord Ray. 1167, S. C. 1 Salk. 174.) Starkie declares, that a general averment that the defendant did conspire, &c. to accomplish an object apparently criminal, is sufficient without showing in what manner and by what means the conspiracy was to be produced. In strictness it is not necessary to allege any overt act done in pursuance of the criminal design. (Stark. C. Pl. 170, 1.) In Rex v. Kinnersley and Moore, (1 Str. 193,) it was decided that no overt act need be laid in the indictment, and several

cases are there referred to wherein such indictments were held good.

It is supposed that a conspiracy to commit a crime is merged in the crime when the conspiracy is executed. This may be so where the crime is of a higher grade than the conspiracy and the object of the conspiracy is fully accomplished; but a conspiracy is only a misdemeanor, and when its object is only to commit a misdemeanor it cannot be merged. Where two crimes are of equal grade there can be no legal technical merger. This court had this question under consideration in the case of *Bruce*, and there intimated an opinion that a conspiracy to commit a misdemeanor was not merged in the misdemeanor when actually committed.

As those who were concerned with the defendant, if he was one of the conspirators. or some of them, were known (as it appeared on the trial they were) to the grand jury when the indictment in this case was found by them, the allegation therein that the defendant conspired with persons unknown is improper it is said, and that on such an indictment the defendant cannot be convicted. An indictment should contain so much certainty as clearly te designate not only the particular kind of offence, but the specific criminal act for which the accused is to answer. If there has been a murder, the name of the person killed must, if it can be ascertained, be stated in the indictment. This the accused may reasonably require, that he may know what he has to answer; but if he had associates, I apprehend that they need not be named, because a charge of that nature may be made sufficiently certain without a disclosure of their names. So if a person is charged with a larceny, the indictment ought to shew who was the owner of the goods stolen, that the accused may know for what act he has to answer. But in a charge of conspiracy it seems no more necessary to specify the names of the defendant's coadjutor than in an indictement for an assault and battery to name others besides the accused who were concerned in the trespass, if the fact were really so. In *Kinnersley and Moore* a case is mentioned where this point was directly passed on. This bill presented

NEW-YORK,
May, 1830.

The People
v.
Mather.

to the grand jury charged, that *Herne* with A. and *cum multis aliis* conspirated to accuse B. of a felony. The grand jury returned the bill with an *ignoramus* as to *A.* Then the charge against *Herne* as presented by the indictors was, that he with many others conspired, &c. The indictment was objected to as insufficient on a motion to arrest the judgment; but the court denied the motion, and said the indictment was sufficient, it being found that *Herne* with many others did conspire, &c. and it might have been so laid at first. Where a person was indicted for engrossing hay and straw, and the act was charged to be done by him and *twenty-seven* others, an exception was taken to the indictment, that the names of each person of the twenty-seven was not set forth; it was overruled on the ground that it was not necessary to set out their names. (*Cro. Car.* 380.) It does not appear that the persons not named were unknown, or that the indictment in either case charged them to be unknown. I am satisfied, on reason and authority, that the objection taken to the indictment in this case on this account is not sustainable.

The right of a court to grant a new trial in case the defendant has been acquitted, is called in question by the defendant. That such right does not exist where the ground of the application is that the finding is against evidence, is conceded; but whether a new trial can be granted where the acquittal has resulted from the error of the judge in stating the law to the jury, seems to be involved in much doubt. It is a very important question, and not necessary to be now settled; the court have, therefore, deemed it discreet to forbear expressing an opinion on it till a case shall arise requiring them to do so.

Motion for a new trial denied.