Walworth, Chancellor.
The question presented in this case is; whether the real owner of a negotiable note which is usurious, can, by bringing a suit thereon in the name of a third person as the nominal plaintiff, evade the provisions of the second section of the act of May, 1837, to prevent usury. That section provides that whenever, in an action at law, the defendant shall plead or give notice of the defence of usury, and shall verify the truth of his plea or notice by affidavit, he may, for.the purpose of proving the usury, call and examine the plaintiff as a witness, in the same manner as other witnesses may be called and examined. (Laws of 1837, p. 487.) The object of the legislature imquestionably was to save to the defendant the useless expense of filing a bill for discovery and relief, or for discovery only, in the court of chancery, under the subsequent provisions of this statute, upon the technical ground that the plaintiff in the suit at law could not be called as a witness for the defendant or compelled to make a discovery at law, by the rules of the common law. And the legislature having adopted the principle that the usurer should be compelled to discover the usury, although the effect of such discovery might subject bim to the loss of, or rather prevent him from recovering, the money actually loaned and the legal interest thereon, there certainly is no good reason why either party should be subjected to the expense and delay of a chancery suit when an equally efficient remedy can be given by authorizing the examination of the alleged usurer as a witness, in the court of law, for the purpose of obtaining such discovery. I have no doubt, therefore, that the legislature intended to authorize the real plaintiff in the ae *525 tion at law to be examined • as a witness for the defendant, to prove the usury; whether he was the nominal plaintiff on the record, or the suit was brought in the name of some other person for his benefit. Whether it was not a violation of sound and correct principles thus to tempt the usurer to commit perjury, by compelling him to answer on oath to the charge of usury with a certain knowledge that he would not only lose the usurious premium agreed upon, but also the money actually loaned, if he swore to the truth, is a question which belonged to the legislature, and not to this court to decide, if the law itself was not a violation of the constitution.
The act of 1837 makes the actual taking of usury an indictable offence; but not a mere agreement for a usurious premium to be paid at a future time. The crime, therefore, is not consummated until the usury is actually received by the usurer, either directly or indirectly. And a witness could not be indicted upon a discovery of the fact that the agreement was usurious, so that no recovery should be had in the suit where no usury had previously been received. It is very questionable, then, whether, under this statute, the real plaintiffs in the present case could have been excused from answering questions to prove a mere agreement to take usury, even if the eighth section of the act of 1837 had not been passed. The constitution provides that no person shall be compelled, in any criminal case, to be a witness against himself. But if a mere agreement to take usury was an indictable offence, or if usury had actually been" taken by the plaintiffs, the eighth section of the act of May, 1837, removes the constitutional difficulty, in compelling them to answer, by declaring that the testimony given by any plaintiff, or the answer in chancery of any defendant, under the provisions of that act, shall not be used against such person before any grand jury, or on the trial of any indictment against him. And if the provision of the second section of the act was intended by the legislature to apply to the real plaintiff in interest in the action at law, and not merely to the nominal plaintiff as I think it was, then the restriction upon the use of the testimony, under the provision in the eighth *526 section, is equally extensive; and such testimony cannot he given in evidence in any criminal proceeding against him.
It is true, by the common law, a witness was not compelled to answer any question,, nor was a party to a suit in chancery bound to discover any matter, which would subject him to any loss in the nature of a penalty or forfeiture. But the constitutional provision for the protection of the rights of parties and witnesses is not so broad. It is, therefore, in the power of the legislature to change this humane principle of the common law, so far as it can be done without a violation of the constitution. And as they have thought fit to change this rule, so far as relates to the forfeiture of money loaned upon usurious contracts, it is the duty of the courts, so long as that statute remains in force, to carry its provisions into effect. The decision in the case of Mauran v. Lamb, (7 Cowen’s Rep. 174,) was in accordance with the principle of the common law that a witness, whether he was the real party to the suit or otherwise, was not bound to make a disclosure which would forfeit the money actually lent and the interest thereon. But as the legislature has changed the rule itself, so far as relates to the discovery of usury,, that case is no longer an authority for excusing a party in interest from answering a question as to the usurious nature of the contract upon which the action is brought, where the only effect of such evidence will be to subject him to the loss of money lent upon such contract. In other words, the legislature has extended the principle declared by Lords Eldon and Erskihe and eight of the English judges, upon the Lord Melville witness-indemnity-bill, (6 Parl. Debates, first series, 234,) to this case of usury, so far as mere witnesses are concerned; and have compelled the plaintiff himself to be a witness to establish the usury, granting him an indemnity against criminal prosecution founded upon his testimony.
The case of Kempshall & Eggleston v. Burns, (4 Hill's Rep. 468,) which was before this court last year, does not conflict with the view I have taken of the statute in relation to these cases. There, the person who was called as a witness was neither the nominal plaintiff in the action, nor was he the real *527 plaintiff in interest; and he swore that he could not answer the question propounded without criminating himself. In other words, he was not within the protection of the 8th section of the statute, as the nominal or real plaintiff; and if he swore to the truth, he had actually received usury, so that he might subject himself to a criminal prosecution in case he should make a disclosure of the facts to which he was called upon to testify.(a) But in that case, as I had previously done in the case of Beggs v. Butler, (9 Paige's Rep. 226,) I clearly intimated my opinion that the real plaintiff in the suit could not evade the law by instituting a suit in the name of another person, and that the provisions of the act of May, 1837, extended to the real as well as to the nominal plaintiff in the action at law upon the alleged usurious contract; but that the eighth section of the act was not broad enough to protect a mere stranger to the suit from a criminal prosecution founded upon his evidence therein.
In the case now under consideration, I think the witness was compelled to testify, he being the real plaintiff, even if he had received a portion of the usurious premium so as to subject him to indictment mider the act of 1837. And provided he was not the real plaintiff, but a mere witness, he was bound to testify if he had made an usurious contract merely, without having actually received the usurious premium so as to subject himself to a prosecution for the offence.
I am of opinion the judgment of the court below should be reversed, and a venire de novo awarded.
Root, Senator.
The political economists of the late and present generation have introduced a fashion of thinking that money is merchandize, that its possessor should be allowed to take such price as he can get for it, and that therefore all usury *528 laws are wrong and ought to be repealed. To expose the fallacy of this position, as well as the inference drawn from it, and to. show, moreover, that usury is forbidden by the common law, and that a repeal of the statute laws, whether by legislative or judicial enactment, would Revive that law, I shall take a historical view of the subject which might otherwise appear-extraneous and unnecessary.
Usury in its original and primitive meaning, is a premium or reward for the use of money or other commodities or things. By the Levitical law the Jews were forbidden to lend upon usury to one of their own kindred or nation, though it was lawful so to lend to a stranger. . “ Thou shalt not lend upon usury to thy brother; usury of money, usury of victuals, usury of anything that is lent upon usury: Unto a stranger thou mayest lend upon usury; but unto thy brother thou shalt not lend upon usury; that the.Lord.thy God may bless thee in all thou settest.thy hand to in the land whither thou goest to possess it.” (Deut. xxiii. 19, 20.)
To lend money upon usury was always forbidden by the Jewish laws. It was an offence against religion as well as morality. The royal minstrel of Israel, when chanting the virtues of those who might be permitted to abide in the tabernacle of the everliving God, and to dwell in his holy hill, gave a high rank to him “ that putteth not out his money to usury.” (Ps. xv.)
On the propagation of the Christian religion the same moral, and religious feeling against the usurer accompanied its spread; and on the establishment of the Christian church, usury was held criminal by the canon law. The Jews were then scattered among the gentile nations, and they-esteemed all among whom they sojourned as strangers to the house of Israel, and therefore not brethren within the pale of the law of Moses. Of course they became the exclusive usurers; but they were for that cause held in detestation by all Christendom.
' Usury was forbidden by the common law of England. Whether the prohibition was introduced by the Anglo-Saxons, or sprang out' of the establishment of the Christian church and the introduction of the canon law, are questions which the *529 obscurity of ages will not allow us to solve. It was declared to be the common law by the statutes of England and by their higher courts of law. The preamble to the statute 37th Hen. 8, ch. 9, recites that “whereas before this time divers and sundry acts, statutes, and laws have been ordained, had, and made within this realm, for the avoiding and punishing of usury, being a thing unlawful, and of other corrupt, gains, shifts and chevisanees, which acts, statutes and laws have been so obsciue and dark in sentences, words and terms” &c.; and it then goes on to mention the ambiguities &c., adding, “by reason of which, oifenders have escaped punishment, and rather been encouraged to use the same.” Lord Ch. J. De Grey said, in the case of Lloyd, qui tam &c. v. Williams, (3 Wilson, 259,) “ usury is money given for the use of money for any certain time, and is called at this day (1771) the interest thereof. The lending or letting out money at interest, or upon usury, before the statute 37th Hen. 8, ch. 9, was against the canon law, the common law, and the statutes of the realm. It was forbidden by the laws of King Alfred.”
When agriculture and the arts began to improve, and commerce to extend itself, credit became convenient if not necessary to their further expansion. Then the rigorous extent of the canon and common law had to give way. By the statutes 3d and 11th Hen. 7, it was allowed to take 10 per cent, for the forbearance on the sales of commodities, but not on the loan of money. By the latter statute it was provided: “ He that lendeth his money upon usury, or maketh any bargain of lands or goods, grounded upon usury, shall forfeit one half of the money lent,” &c.
In tlie latter part of the reign of Henry the 8th, encouraged by the activity of that prince, the agriculture, the manufactures and the commerce of England had made progressive improvements. They needed, for their further extension, a more extended and regulated credit. Accordingly, the statute 37th Hen. 8, ch. 9, was passed. It allowed a person to take 10 per cent. “ for the forbearing or giving day of payment of and for his money or other things.” It allowed usury, it seems, or an in *530 terest to be taken for the use of money. But soon afterwards, by statute 5th and 6th Ed. 6, ch. 20, it was observed that the statute 37th Hen. 8, allowing the rate of interest, had been construed to give a licence and sanction to all usury not exceeding 10 per cent., and this construction was declared to be utterly against scripture, and therefore all persons were forbid to lend or forbear, by any device, for any usury, increase, lucre, or gain whatever, on pain of forfeiture, fine and imprisonment. By the statute 13th Eliz., the statute of 37th Hen. 8 was restored, with additions. By the statute 21st James 1, ch. 17, the rate of interest was reduced to eight, and by the 12th Charles 2, to six per cent. By the 12th Ann., st. 2, ch. 16, the rate was reduced to 5 per cent., at which, in that country, it remains to this day.
The preamble to the statute 12th Ann., may not be entirely uninteresting on an inquiry into the moral fitness of the statutes of usury. It recites the great expenses of the late war, and that they were chiefly borne by the landed interest. It speaks of “ the great abatement of the value of merchandizes, wares, and commodities, both at home and in foreign parts;” and says that “ for the redress of these mischiefs, and the preventing the increase of the same, it is absolutely necessary to reduce the high rate of interest of six pounds in the- hundred pounds for one year, to a nearer proportion with the interest allowed for money in foreign parts.” That statute provides that no person shall “ take directly or indirectly, for the ban of any monies, wares, merchandize, or other commodities whatsoever, above the value of five pounds for the forbearance of one hundred pounds for a year, and so after that rate” &c. It also provides that “ all bonds, contracts, and assurances whatsoever, made for payment of any principal or money to be lent, or covenanted to be performed upon or for any usury, whereupon or whereby there shall be re-r served or taken above the rate of five pounds in the hundred as aforesaid, shall be utterly void.” It then provides that every person taking over 5 per cent, by means of any corrupt bargain &,c., or by any deceitful way and means &c., shall forfeit treble the value &c.
The statute of Ann., being enacted in derogation of the com *531 mon law, was always limited by the English courts to the cases in which usury or interest was allowed. And it being for the benefit of trade and manufactures, as well as of agricultural production, that credit should be encouraged, and it appearing from the preamble that the object of the legislature was to encourage and regulate that credit and reduce it to a system, the law was construed according to its obvious intent. The courts have uniformly supported its spirit; for however disguised the agreement might be, if in fact it was usurious, it has been held to be void. (5 Wils. Co. 69.) If the intention of the parties to the contract be corrupt in the substance and design, no pretext, however plausible, no contrivance, however specious, no coloring, however artful, can veil the transaction. Crimen omnia ex se nata vitiat, is a maxim applied to such cases. The crime or offence, however small or disguised, pollutes everything springing out of, or connected with it. “A little leaven leaveneth the whole lump.” Even a little poison infused into the mass is sufficient to corrupt the whole.
In Lord Mansfield’s time a suit was brought by an innocent indorsee without notice, against the acceptor of a bill of exchange. The bill was drawn and accepted on a contract growing out of the sale of goods. The usury was artfully concealed, but his lordship said, “ It is impossible to wink so hard as not to see that there was no idea between the parties of any thing but the loan of money. They did not act as persons selling goods upon credit to be paid for at a future day.” On a subsequent day Lord Mansfield delivered the unanimous opinion of the court as follows: “ We have considered this case very attentively, and I own with a great leaning and wish on my part, that the law should ton out to be in favor of the plaintiffs. But the words of the act are too strong. This is one of those instances in which private must give way to public convenience. It is less mischievous that the law should be as it is with respect to bills and notes, than other securities; because they are generally payable in a short time, so that the endorsee has an early opportunity of recurring to the endorser if he cannot recover upon the bill.” (Dougl. 736, 744.)
*532 Such were the laws of England, in this respect, at the time of the American revolution. Such were the laws of the colony of New-York; and such the laws she ingrafted upon her constitution when she became a free and independent state. By the constitution of the state of New-York of 1777, § 35, it is ordained, “ that such parts of the common law of England and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New-York, as together did form the law of said colony on the 19th day of April, 1775, shall be and continue the law of this state, subject to such alterations and provisions as the legislature of this state shall from time to time make concerning the same.” By this provision, and subsequent legislation, the statute of Anne, unaltered in its leading features, and unimpaired by judicial decision, became the law of this state, and continued so till the 1st of May, 1788. On that day all English statutes ceased to be law in this state, but the statutes revised by Jones and Varick. commonly known as GreenleaPs edition, then came in force. This revision was but a compilation and re-enactment of the old statutes. The statute of Anne was therein re-enacted, and almost in the same words; the same at all events in substance. It was entitled “ An Act for preventing usury,” and passed February 8th, 1787. It provided that no person should “ take directly or indirectly, for loan of any moneys, wares, merchandize, or other things whatsoever, above the value of seven pounds for the forbearance of one hundred pounds for one year, and so after that rate” &c. It also provided that “ all bonds, bills, notes, contracts and assurances whatsoever, and all deposits of goods or other things whatsoever, for payment of any principal, or money to be lent, or covenanted or agreed to be paid upon or for any usury, whereupon or whereby there shall be reserved or taken, or secured, or agreed to be reserved or taken, above the sum of seven pounds in the hundred, as aforesaid, shall be utterly void.” Instead of the treble forfeiture by the statute of Anne, this act allowed the . person paying usury to recover it back if sued for in one year. If not bona fide sued for in that time by such person, then any other person, qui tam, might prosecute for the same. *533 In the revised statutes of 1801, and also of 1813, the act of 1787 is published without revision or alteration.
The laws regulating interest and to prevent usury remained the same, without any essential variation, for more than a century. The meaning of terms had, it is true, somewhat changed. Usury had become an unlawful, and interest a lawful premium for the forbearance of payment. The rate of interest, for this state, had been increased. But the law was the same till the revised statutes of 1830. Judicial legislation had indeed attempted many changes. Chancery, in the exercise of its equitable jurisdiction, had decreed that a complainant must do equity, before he could receive equity; that is, that he must make valid, and to the extent of the chancellor’s caprice, what the law had declared to be void. The supreme court too, in defiance of law, and in imitation of chancery, allowed the plaintiff to recover the amount of his demand exclusive of the usury. Recoveries were allowed on promissory notes and bills of exchange, although void in their inception by reason of usury, when in the hands of innocent indorsees. Following the fashion of the times in pronouncing all laws regulating the rate of interest injurious to the public weal, our courts seemed to strive, by the very contrivances they were bound to detect, to evade the operation of the statute. The revisers, in their zeal to transform every judicial decision, however crude and erroneous, into statute law, reported several sections for enactment, of those decisions evasive of the act for preventing usury. The legislature struck out all but one of these provisions. The latter provision of the 5th section of title 3, chap. 4, part 2, of the revised statutes, which exempts from its operation bills of exchange and promissory notes in the hands of bona fide holders, without notice of usury, was retained. I think a majority was obtained for its retention, by stating that the British parliament had passed a similar provision and our courts had decided that such was the law; and urging the fitness of the law being uniform, in this respect, in the two countries so nearly connected in their commercial relations. But the omission of the word contracts, by the revisers, in the same 5th section, I presume was not observed by a majority of the *534 members. If it had been, and its object and effect been known and perceived, the word would have been restored. The omission was intended—so the revisers avow in their notes—to let the encroachments of the courts stand as the law of the land.
These were the evils calling for a remedy. The courts had usurped, or endeavored to usurp the powers of legislation. By extending exemptions from the operation of the statute, they had nearly rendered it nugatory, and given a general licence to the usurer. The revisers had reported, and the usurers and their friends in the legislature had stealthily passed, clauses and provisions of acts which, in a great measure, legalized those encroachments. To remedy this great evil, and to restore the law, which had been so cruelly mutilated, to its former vigor, and to give to it full efficacy, the legislature of 1837 passed the act entitled “ An Act to prevent usury.” This is to all intents and purposes a remedial statute. It was passed to apply a remedy to existing evils, and “ to prevent usury ;” to prevent the usury which had incautiously been licensed. It should be so construed as to carry out and apply the remedy intended. To give to the act vital energy and efficacy, it was provided by the 2d section that the defendant might call upon the plaintiff to disclose under oath the latent usury; to expose the “ shift or contrivanceby which the facts were concealed. Similar calls for' disclosure had long been practised in chancery, and an exactly similar call is allowed to the defendant where the demand on which the suit is brought has been bought and sold, or received for prosecution contrary to law. The question now arises, in what relation to the suit must the person stand whom the defendant may call upon to disclose the facts he relies upon in his defence? The statute calls him “ the plaintiff'? Then who is the plaintiff intended? The party in interest—the real plaintiff—the one for whose benefit the suit is brought—the one who knows, or is supposed to know the facts sought to be disclosed. Yet Mr. Justice Bronson, and with apparent seriousness, says: “ The legislature evidently had in mind the parties to the record, and no one else.” I cannot imagine what evidence the learned judge possessed which led him to this conclusion, but *535 am inclined to believe it was of a kindred character with that which induced him to call in question the morality of this statute. ' If the members of the legislature intended to pass a law, apparently for the cause of public virtue, and at the same time in such manner and form as that the astute offender could in every instance evade its sanction, then indeed is its morality very questionable. The judge says, moreover, “ If the provision is not broad enough, the act should be amended.” He decides that it is not broad enough, and it is evident to him that the legislature purposely left it so!
I am aware that the lawyers generally understand, and so I have in some measure treated the subject myself, that the decisions of our higher courts establish the law upon the matters decided, and that such decision becomes the law of the land to govern thereafter in all cases to which it applies. That notion of the power and efficacy of judicial decision most probably has its influence with the members of this court. I hope it will not, however, have such an influence as to induce them to treat legislative enactment as secondary and subordinate to judicial decision, and under its control. I hope we shall consider what a decision really is, and treat it accordingly; not as the law, nor as giving the law, but simply as evidence of the law: and not conclusive evidence, but only prima facie evidence of what the law is. The most deliberate and mature decision of our highest court is but prima facie eviden.ce of the law; for the legislature may declare it otherwise.
Another circumstance, I have reason to fear-, has had an influence upon the decisions of courts in relation to the statutes of usury. I mean public sentiment. It cannot be denied that the writings of Jeremy Bentham and others, the essays and speeches we have so often read and heard, have made an impression upon the public mind that all statutes of usury are wrong.: that money is an article of merchandize, and that a man should have a right to get for it the highest price he can obtain in market: that he should have a right to bargain for it as for his cattle or his grain. This argument is specious and popular, but does not very aptly apply to *536 the case. In the first place, it is not the money for which we pay the premium or price under the name of interest. It is credit for which we pay the premium. We pay a price for the forbearance of payment. This forbearance is the credit we obtain, the price of which the statute assumes to regulate. If we buy goods upon our own credit, we pay a premium by way of interest for that credit. If we buy the goods on the credit of another person, we pay that person the premium. If in payment for the same goods we borrow the amount of our neighbor in bills of exchange, promissory bank notes, or any other medium of exchange which the vendor will accept, and promise to return him others of equal value at a given time, we purchase the goods on a credit and we pay our neighbor a premium for that credit. Whether these bills of exchange be written or printed on a piece of gold or silver, or upon paper, it matters not. If they pass current as a medium of exchange, they are equally valuable, being based upon a regulated credit. In the second place, money is not an article of merchandize. It cannot be bought and sold in market. Money is the medium of exchange and measure of value. It is a circulating credit called currency. Whether its credit arises from the intrinsic value of the thing on which the measure is stamped, or its certain convertibility into that of intrinsic value to the same amount, it is money. It is not merchandize. No one will pretend that paper money is merchandize, nor that bars of silver or ingots of gold are money. Hard money, or specie, is a coin of the precious metals, of a certain weight and fineness, with the government stamp thereon, denoting its value as a medium of exchange, or currency. Make that coin an article of merchandize; send it into market and sell it as such, and it ceases to be money. But you cannot make merchandize of it until its intrinsic value shall exceed its value as money. Nobody will give you in money more for your money than it is worth in money. If the intrinsic value of the coin is greater than its value as a currency, it will cease to he current, and be sold at an advance as bullion. The Spanish Carolus dollar is not now in circulation as money, because it will fetch five or six per cent.- premium for exportation. The *537 eagles and half eagles of the old coinage are not money. They do not pass as money. The eagles are worth ten dollars and sixty cents apiece for the crucible, for exportation or re-coinage. They are merchandise, called bullion, and are bought and sold as such: they' are not money. When coins of the precious metals were the only circulating medium of exchange, and their worth was only estimated by their intrinsic value, then indeed it was an easy error, if an error at all, to slide into the supposition that money was an article of merchandize. The distinction between money and bullion was very slight, and seldom made. But in the immense increase of trade and commerce, and, of course, vast increase of credit, a paper currency, from its great convenience, if not necessity, has become the money of the country. Silver and gold coins scarcely form a part. In the business concerns of this trading people, they are merely used as small change; as bank tokens. The money, the circulating medium of exchange, is a transferable credit—inland bills of exchange, founded upon credit, I will ask then, if credit is not only the life and soul of the great business concerns but also supplies the exchanges of the country, whether there is not a fitness, nay a necessity for its regulation by law 1 If a reduced and well regulated rate of interest was necessary in the reign of Queen Anne, to relieve the distresses of a protracted war, surely such regulation is necessary now when credit constitutes the money itself. Frequent and sudden elevation and depression in the price of. any commodity of general use, often occasions individual distress, and always disturbs the course of business; but no human law can prevent their recurrence. Vibrations in the premium for an extension of credit, at the present day, are far more injurious. They can, in a great measure, be prevented by law, if that law be properly enforced. Let it then be enforced according to the intention of the legislature, and let the decision of the supreme court be reversed.
Putnam, Senator.
The second section of the act of May 1837 to prevent usury, is as follows: “ Whenever in an action at law the defendant shall plead or give notice of the defence of *538 usury, and shall verify the truth pf his plea or notice by affidavit, he may, for the purpose of proving the usury, call and examine the plaintiff as a witness, in the same manner as other witnesses are called and- examined.” (Sess, L. of 1837, p. 487.) It is contended that the term “ plaintiff” used in this section embraces not only, the party .appearing- to be such by the record, but also any party interested as plaintiff, whether his name be mentioned in the record or not.. I am unable to concur in this' view. On the contrary, it is to my mind most manifest that the. person intended by the legislature is he whom the record designates as plaintiff,.and he alone.
The current of authority at the present day, it has been-well remarked, is in favor of reading statutes according to the natural. and most obvious - import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation. (Per Bronson, J. in Waller v. Harris, 20 Wend. 561, 2.) It is also laid, down by Chancellor Kent, in his commentaries, that “ the words of a statute, if of common usé, are to be taken in their natural and- ordinary signification (1 Kents Comm,. 462, 4th ed.;) and this I under stand to be an elementary rule. By availing, ourselves of the doctrine thus advanced, in construing the statute under consideration, it seems to me we shall be led directly to the conclusion at which the learned judge arrived who delivered the opinion of the court below. The term plaintiff is one in common use; and in legal acceptation as well as in popular language it signifies the party in whose favor the plaint or suit purports on the record to have been instituted. When the suit is in his name for the benefit of some other person, the term plaintiff as applied to the. latter,. without any addition, would be an incomplete designation ; for he is known only as the plaintiff in interest or real plaintiff, while the former, by way of distinction, is called the plaintiff on the record or nominal plaintiff. These additions are especially common not only, but necessary, where both relations are intended to be expressed, as it is said .they were in the section above referred to. That section, in any view which can. be taken ,of it, involves an important innovation upon a well estab *539 lished rule of the common law; and it was probably drawn up and adopted with a caution and deliberation commensurate with its importance. Had the legislature intended it should be construed as the parties bringing this writ of error contend, they would have used clear and explicit language; and instead of authorizing the defendant to call and examine the plaintiff, and stopping there, they would have said he may call and examine either the plaintiff on the record or the plaintiff in interest. It seems to me, therefore, that the absence of any such qualifying phraseology is conclusive that the legislature had in view no other person than the one usually known as plaintiff, viz. the plaintiff on the record.
The above view may be further illustrated by reference to the course of legislation in kindred cases. By 2 R. S. 288, § 71, attorneys &c. are prohibited from buying choses in action or becoming interested in buying them, with the intent and for the purpose of bringing any suit thereon. The 75th section provides, that “ the defendant in any suit to be brought in any action of debt, covenant or assumpsit, may give notice with his plea, in addition to any other matter of defence, that on the trial of the cause he will insist and prove that the demand on which such action is founded, has been bought and sold, or received for prosecution contrary to law,” &c. It is then provided by the 76th section, as follows: “ On the trial of the cause in which such notice shall have been given, if the defendant shall require it, the plaintiff, and his attorney and counsel, and any other person who may be interested in the recovery in such cause shall be examined on oath touching the matters set forth in such notice.” Here the legislature have themselves construed the meaning of the term “ plaintiff,” virtually telling us that it includes only the plaintiff on the record, and not “ any other person who may be interested in the recovery in the cause.” These latter words, if the rule of interpretation now insisted upon be correct, are utterly destitute of all force, and amount to nothing more than a “ vain repetition”—mere idle surplusage. And yet, in framing the 81st section of the same statute, the legislature again evince their sense of the limited meaning of the word *540 “plaintiff” by continuing the like ample phraseology. That section is thus : “ If any such plaintiff so required to be examined, or if if any other person being interested in the recovery shall refuse to answer on oath &c., the plaintiff in such action shall be nonsuited.”
The statute in relation to set-offs may also be referred to as containing a legislative recognition of the limited meaning of the word “ plaintiff.” The 18th section of that statute (2 R. S. 354) commences thus: “ In the following cases, and under the following circumstances, a defendant may set off demands which he has against the plaintiff.” By the 10th subdivision of that section it is provided as follows : “ If the plaintiff be a trustee for any other, or if the suit be brought in the name of a plaintiff who has no real interest in the contract upon which, the suit is founded, so much of a demand existing against those whom the plaintiff represents, or for whose benefit the action is brought, may be set off, as will satisfy the plaintiff’s debt, if the same might have been set off in an action brought by those beneficially interested.” Here the legislature obviously used the term “ plaintiff” according to its ordinary and popular import, viz, as indicating the plaintiff on the record, and no one else.
Again: that the word “ plaintiff,” when, used by the legislature, is to be understood as referring solely to the ostensible party, Unless qualified by some added phraseology, is manifest' from the statute relating to costs. By the 16th section of that statute the defendant is entitled to judgment against the plaintiff for costs, if the plaintiff fails in the action; (2 R. S. 615;) and by the 44th section it is provided as follows: “ Where any action shall be brought in the name of another, by an assignee of any right of action, or by any person beneficially interested in the recovery in such action, such assignee or person shall be liable for costs in the same cases and. to the- same extent in which a plaintiff would be liable.” (Id. 619.)
These statutes plainly show that when the legislature intend to refer to the party beneficially interested as plaintiff, in addition to or in contradistinction from the plaintiff on the record, *541 they do so by express and unambiguous phraseology, leaving no room for cavil or doubt; and I have looked in vain for a single instance where this practice has been departed from. So that, whether the term “plaintiff” in the act of 1837 be construed according to its natural and ordinary import, or according to legislative usage, in either case it points only to the plaintiff on the record; and by thus expounding it we shall conform to the settled rules of interpretation, while at the same time we shall avoid the error of overstepping the boundary of judicial duty and invading the province of the legislature.
Besides, the act in question is highly penal in its character. It imposes upon the party taking usury a forfeiture of the entire debt not only, but the sixth section declares him guilty of a misdemeanor and liable to a fine not to exceed $1000, or six months imprisonment, or both. The rule laid down by Savage, Ch. J., in Myers v. Foster, (6 Cowen, 567, 569,) viz. that penal statutes are not to be extended by equitable construction, applies to this case with peculiar- force.
It was insisted on the argument that if Chapman was not to be regarded as the plaintiff in the cause, then he stood in the situation of any third person, and might be compelled to testify. To this, however, there are two answers, one of which is that he was a party in interest, and might lawfully refuse to testify on that ground. In Cook v. Spalding, (1 Hill, 586,) the very point arose, and Mr. Justice Bronson, who delivered the opinion of the court, said: “ This question was decided in Mauran v. Lamb, (7 Cowen, 174.) It was there held that the real plaintiff, though not a party to the record, could not be required, without his consent, to give evidence for the defendant. In The People v. Irving, (1 Wend. 20,) it was again held that a party in interest cannot be compelled to testify without his consent. The same doctrine was also recognized in Jackson v. Myers, (11 Wend. 537.) The cases of Appleton v. Boyd, (7 Mass. Rep. 131,) and White v. Everest, (1 Verm. Rep. 181, 2,) are to the same effect.” It was also decided in Cook v. Spalding, supra, that the provision in 2 R. S. 405, § 71, did not change the rule on this subject. But again, a still further difficulty in compelí *542 ing Chapman to testify, arises out of the 6th section of the. act of 1837, which, as has been before remarked, makes the taking of any greater interest than seven per cent, a' misdemeanor. The rule Of law is well settled that a witness is not bound to answer any question that may have a tendency to accuse himself of a crime or misdemeanor. (See 2 R. S. 405, § 71.) I know it is said that'the witness can swear with impunity, unless he has received unlawful interest. But it has been decided, and'I think rightly, that a witness is not bound to swear to any thing which would form a link in the chain of proof necessary to convict him. (See The People v. Mather, 4 Wend. 252 to 254; Mitchell v. Hinman, 8 id. 667, 671; Burns v. Kempshall, 24 id. 360, 4 Hill, 468, S. C. on error; Cloyes v. Thayer, 3 id. 564.)
I am of opinion that the decision of the court- below was correct,-and shall therefore vote to affirm it.'
Rhoades, Senator.
My.first impressions on .the hearing:of the argument in this cause, were in favor of giving that construction to the law of. 1837 which was contended for by the plaintiffs in error; but upon more mature reflection, and a careful examination of the subject, I aim constrained to come to a different conclusion.
The most common and obvious sense in which the terms plaintiff and defendant are used, both in speaking and writing, is in their application to the person in whose name a suit at law is brought,, or the person against whom a suit is brought. All lexicographers agree in this, and, so far as I am able to discover, seem not to have contemplated the úse of these terms in any other sense. The word plaint is defined by Webster to be a memorial tendered to a court, in which the person sets forth his cause of action. Plaintiff, which is a derivative from the word plaint, he defines to be “ the person who commences a suit before a tribunal for the' recovery of a claim; opposed to defendant.” The terms plaintiff and defendant appear to be correlative, the existence of the one depending upon that of .the other; and there are no proceedings known to the *543 law in which they are not used in their strict technical sense, unless in cases specially provided for by statute or ascertained by the well settled judgment of courts of law.
But it is said that courts are bound to look, not at the strict technical definition of words as used in our statutes, but to the object and intention of the law makers. This is unquestionably true where the intention of the legislature is apparent, and where, owing to the imperfection of language, there has been some difficulty in expressing that intent, or where the words used are of ambiguous or doubtful interpretation. There is no doubt in my mind that it was the intention of the legislature in framing the act of 1837 in relation to usury, to cover all cases of usury which might occur in the ordinary transactions of the business of this state. The design of the act was far-reaching; but if it does not extend to every case, it will not be the first time that the legislature have intended to provide by law against an evil, and for the want of forecast to discover how the law might be evaded, or the neglect to use plain and definite language, have failed to accomplish the whole object. I have no doubt, had the suggestion been made to the legislature of 1837 that a case like the one before the court might arise, the second section of the act, which provides that the defendant may call and examine the plaintiff as a witness, would have been so changed as to include the party in interest not only, but any other person who directly or indirectly had taken the usury, although not then a party in interest, and that the legislature would have extended to them also the provisions of the 8th section of the act. This, in my opinion, they have omitted to do; and although this court may be authorized to effectuate legislative intentions in some cases, they cannot provide by their judgment for palpable legislative omissions. It would be hardly safe to carry the doctrine of judicial interpretation so far as to cover a case like the present; one which might so easily have been provided for by apt and proper words.
It has been said that, by the construction which is given to this act by the supreme court, the law may be so easily evaded as to render its provisions nugatory. This perhaps may be in *544 some sense true, as in the case before the court. But suppose the witness Chapman, just before he was called to the stand, had sold his entire interest in this note to the Bank of Salina. He could not then have been obliged to testify to the usury, even if the court below had sustained the ground taken by the plaintiffs in error. For in that case he would have been neither the plaintiff on record, nor the plaintiff in interest; and the provisions of the eighth section would not have shielded him from a criminal prosecution .founded on his testimony. A reversal of the decision of the supreme court, therefore, will not cure the defects in this law, or prevent its being evaded; but the remedy is to be sought in further legislation.
Most of the members of this court, in another branch of their official duties, have much to do with the business of legislation, and hence arises a natural tendency, on their part, while sitting as the expounders of the law, to clothe it with a power which they think it ought to possess, exceeding that with which it is in reality furnished. It is one of the imperfections of all human tribunals, while sitting in judgment upon statute law, to give it that construction which best accords with the views entertained of its propriety or impropriety. In doubtful cases it is unquestionably better as a general rule that we give too limited, rather than too enlarged a construction to legal enactments. The former may be easily corrected by subsequent legislation; while the latter involves a departure from our appropriate sphere of duty, and tends to bring the judicial and legislative departments of the government into collision.
The morality as well as the policy of the act in question has been doubted from high authority. It enables one party to absolve himself from a solemn contract, which, at the time it was entered into, was perhaps for the mutual advantage and benefit of both, and made in good faith. On the trial of a suit upon the contract, the law holds out strong inducements for the plaintiff to commit perjury; and although the defendant who alleges the usury, may absolve himself from his engagement, and come out of the contest victorious, justified in the eye of the law, yet he may find himself with a depreciated character for integrity *545 and with an impaired disposition to fulfil the moral obligation of his subsequent engagements.
That feature in the constitution of the United States which prohibits a state from making any law impairing the obligation of contracts, has been found by experience to be one of its most wise and salutary provisions; and although a state may cautiously abstain from passing any law by which the legal effect of a contract may be impaired, yet it may pursue a course of legislation which shall so essentially weaken and enfeeble the perception of moral obligation among its citizens, in regard to their agreements, as to produce most serious and alarming consequences to the public welfare.
I have no sympathy with the person who violates the spirit or letter of the statute by taking a prohibited interest for money ; nor would I protect him from the consequences of his illegal acts. But from such con siderations as have presented themselves to my mind, and as the law in question is highly penal in its character, I am of opinion that it should not be extended by construction, and that the supreme court decided correctly.
Dickinson, President.
In this case it is conceded that Chapman, the individual called as a witness, was the owner of the note in question, and that the Bank of Salina never had any interest in it. The question is therefore directly presented, whether the holder of usurious paper can evade the operation of the statute by substituting for his own name, in the prosecution of his suit, the name of one having no knowledge of the facts, nor interest in the controversy.
The statute of 1837, authorizing the examination of the plaintiff in actions upon contracts alleged to be usurious, is remedial in its nature. It was evidently designed to furnish a direct and simple mode of examination, in lieu of the cumbrous and involved process by bill of discovery; and if its language will justify the conclusion, it should receive such a construction as will favor rather than defeat the intention of the legislature, and discountenance device and evasion.
This statute authorizes the examination of the plaintiff, not *546 because he is named upon the record, but “ for the purpose of proving the usuryevidently contemplating the examination of the party who agrees to receive usurious compensation for the use of his money, and endeavors to enforce the agreement in a court of law. It had in view the examination of the party in interest—the party actually prosecuting or complaining— hot a mere stranger whose name should be placed upon the record for the purpose of defeating its operations.
The same statute which compels the party to testify, provides that his evidence shall not be used against him in a criminal prosecution; and hence, if -he is a party for the purpose of examination, he is, for the purpose of protection. And when the question shall arise whether he is the real party for either purpose, it must be settled like every other question of fact in a Court of justice, by evidence.
The propriety and utility of usury laws are perhaps matters of legislative rather than of judicial cognizance. And although our code may be defective, harsh and imperfect—its operations in some cases unequal and unjust, and in others ut-. terly ineffectual—yet I apprehend it will be found impracticable to dispense with prohibitory enactments m some form, so long as restraining laws have existence, and corporations are authorized to swell or depress the circulating medium as shall suit their interest or convenience, regardless of the productions Of industry or the state of exchanges.
It has been insisted that usury laws are unjust and odious and should meet with disfavor' at the hands of courts of justice, for the reason that the price of money, if left to the laws of trade, would regulate itself like the price Of wheat and other commodities. This objection so often urged might be answered by saying, were it proper to discuss the question judicially, that if the legislature should prohibit all from engaging in the business of producing wheat, except such corporations and individuals as it might authorize to raise a limited number of bushels, there would then be some analogy between the cases; but at present there is none.
The statutes -upon this subject -should be read ahd construed *547 as other statutes are; and holding as I do, in reference to the present case, that Chapman was “ the plaintiff” whom the act of 1837 gives the defendant a right to “ call and examine,” I am of opinion the judgment of the court below was erroneous and should therefore be reversed.
Bockee and Franklin, Senators, delivered written opinions, the former in favor of reversing, and the latter in favor of affiming the judgment of the court below.
On the question being put, “Shall this judgment be reversed ?” the members of the court voted as follows:
For reversal: The President, The Chancellor, and Senators Bockee, Deyo, Ely, Hopkins, Platt, Porter, Root, Scovil, Sherwood, Varney, and Works—13.
For affirmance: Senators Dixon, Franklin, Lott, Mitchell, Putnam, Rhoades, Varían and Wright—8.
Judgment reversed.
The above case and the next succeeding one of Stevens and others v. White were disposed of at the same time; and immediately after they were decided, the chancellor proposed the following resolution:
Resolved, That the word “ plaintiff” in the second and eighth sections of the act entitled “ An act to prevent usury,” passed May 15th, 1837, extends to the party in interest as plaintiff, although he may not be the plaintiff on the record.
On the question being put, “ Shall this resolution be adopted ?” the members of the court voted as follows:
Affirmative: The President, The Chancellor, and Senators Bockee, Deyo, Ely, Hopkins, Mitchell, Platt, Porter, Rhoades, Root, Scovil, Sherwood, Varney and Works—15.
Negative: Senators Dixon, Franklin, Lott, Varían and' Wright—5.

 The case of Cloyes v. Thayer & Morse, (3 Hill, 564,) is another of the same class. I am informed by the circuit judge who tried this case that he decided in favor of compelling the witness to testify because it did not appear that any usury had been actually received, but only agreed to be received. The bill of exceptions, however, stated the case as I have reported it.