New York County.—Hon. D. G. ROLLINS, Surrogate.—
March, 1882.

## Youngs v. Youngs.

*In the matter of the estate of* Theophilus Youngs, *deceased.*

Courts are not bound, as of course, to grant to a witness the claim of privilege from giving incriminating testimony, simply because he swears that the necessity for its exercise has arisen, but themselves

have an authority and discretion in the premises; and they should not concede the claim where the nature of the question does not, under the particular circumstances apparent at the time, immediately suggest the reasonableness of the claim and the injustice of denying it.

*It seems*, that a witness, who has disclosed, without objection, part of a transaction, wherein, under circumstances tending to criminate him, he has been engaged, is bound, if thereafter questioned, to testify fully concerning that transaction; that, by voluntarily answering in part, as to that very transaction, he waives the privilege of refusing to answer, which he might have enjoyed at the outset, if he had chosen to solicit it.

Letters of administration upon the estate of T. having been granted October 12, 1877, on an allegation of his death, to one who applied therefor as his widow, proceedings were instituted February 27, 1878, by his brother, to revoke those letters on the ground that T. was then alive. A witness was produced who swore, on his direct examination, that he was T., and on his cross examination testified, without reluctance, as to the events of his life prior to 1875, in which year, according to his statement, he left Boston, not visiting that city again until 1880. Upon being asked whither he went on leaving Boston, he declined to answer on the ground that his reply would tend to charge him with a crime. He refused to name any person with whom he had lived or associated during that period, or to state any business or occupation in which he had been engaged. He testified that he had been neither in prison nor under arrest, but when asked if he had been charged with crime, he again invoked his privilege and declared that he would answer no more questions in that regard. *Held*,

1. That since, at the time when the witness refused to answer the questions put to him on cross-examination, he had not disclosed any transaction, whatever, occurring within the five years as to which he subsequently declined to testify, he did not waive his privilege within the rule secondly above stated; but

2. That since, at the time of the refusal, no subject had been broached which even faintly suggested the possibility of witness's connection with the commission of a crime, his bare statement that his answer might tend to criminate him, was an insufficient basis of his claim of privilege; and that he must be recalled for further examination.

In respect to this claim of privilege, there are two extremes which ought equally to be avoided: First, that of requiring, from a witness who has honestly claimed the privilege, any explanation whatever of his reason for refusing to answer, if the court can see how such answer may fairly and reasonably tend to criminate him; and second, that of permitting a witness to interpose the shield of apprehended peril as a protection against every question which he is disinclined to answer, although there be nothing in the circumstances of the case which in the least suggests the danger.

THIS was a motion to vacate an order directing the recall of a witness for further examination. The facts appear sufficiently in the opinion.

ELIAS G. DRAKE, JR., and HENRY BRACE, *for the motion.*

C. ELLIOTT MINOR, *opposed.*

THE SURROGATE.—Letters of administration upon the estate of Theophilus Youngs were granted, on October 12, 1877, to Mary H. Youngs, who had applied for the same as his widow.

On February 27, 1878, his brother, Henry Youngs, instituted proceedings to revoke those letters, claiming that Theophilus was then alive. It was thereupon referred to Edward F. Underhill, Esq., to take testimony upon the issue thus raised. During the examination before him, a person was produced and sworn as a witness, who stated, upon his direct, that he was Theophilus Youngs himself, the husband of the respondent and the brother of the petitioner ; and who gave certain other testimony which has no special bearing upon the question now before me for decision. The witness was then subjected to a searching cross-examination by the respondent's counsel, and was inquired of at length as to various incidents of his life, from his childhood until the year 1875. He testified that, in that year, he left the city of Boston, which he next visited for the first time in August, 1880. As to the events of his life prior to 1875, he gave testimony without reluctance ; but, when he was asked to what place he went when he left Boston, he declined to answer. In response to an inquiry by the referee, he said that he declined because an answer would have a tendency to charge him with a crime. He

stated that he remained for five years in the locality to which he went in 1875. He refused to name any person with whom he had lived or associated during that period, or to state any business or occupation in which he had been engaged. He said that he had neither been in prison nor under arrest; but, when asked if he had been charged with crime, he again invoked his privilege, and declared that he would answer no more questions in that regard.

In all these refusals to answer, he was sustained by the referee. Upon the coming in of the referee's report, respondent's counsel successfully insisted before the late Surrogate that, in sustaining the claim of privilege which the witness had urged, the referee had erred. Surrogate Calvin thereupon made an order that the witness should be recalled for further examination, in the matters touching which he had previously refused to answer. Since the issuance of that order, I have allowed and heard a re-argument of the question to which it relates.

I am now asked, in behalf of the petitioner, to set it aside. Two legal questions, both of the greatest importance in the administration of justice, are involved in this inquiry. It is a strange circumstance that neither of them seems to have been directly passed upon by the courts of this State. This circumstance has led me to give them special consideration, and now prompts me to review at some length the English and American authorities pertinent thereto.

These questions are: 1st, Is a witness, who has to some extent voluntarily testified as to matters tending to criminate him, bound for that reason, despite his claim of privilege, to testify fully upon further inquiry as to

such matters? and, 2d, Does the determination of the right to exercise such privilege belong to the witness himself, or to the tribunal before which he is giving his testimony?

It is earnestly claimed, by the respondent, that the first question must be answered in the affirmative, and that such answer is decisive of the present issue. It is insisted by her that the witness, by voluntarily replying to the inquiries put to him upon the direct examination, was precluded from interposing the claim of privilege which he subsequently set up. No New York decision has been cited, either in support of this position or against it.

The English doctrine, as to the effect of partial disclosure, was established in 1847, in Reg. v. Garbett (2 Car. & Kir., 475; 1 Den. C. C. Res., 236). It has never been questioned since. That case holds (nine of the judges agreeing) that a witness is entitled to the privilege of refusing to disclose what may tend to criminate him, at any stage of his examination when he chooses to assert his claim, and despite the fact that he has already voluntarily answered, in part, as to the same matter.

On the other hand, it has been held, in the courts of several States in our own country, that a witness, although he claims his privilege, may, nevertheless, be compelled to answer questions bearing upon subjects as to which he has previously and without objection given his testimony. A fair exposition of the rule laid down in these American decisions may be found in the case of State v. K. (4 N. H., 562). K. was charged with unlawfully disinterring a dead body. Upon the trial, a witness was called in his behalf, who stated that he knew the

respondent to be innocent, but that he could not tell how he knew, without implicating himself, and he inquired of the court whether he was bound to testify at all, and, if so, how far he was compelled to go. The court held that the witness could not be compelled to declare that he knew the respondent to be innocent, if a full explanation would tend to criminate himself, but that, if he chose to testify at all, he must state how he knew that the defendant was not guilty.

It seems to me that the very broadest statement which the American reports contain, as to the effect of partial disclosures upon the privilege of a witness, is too narrow to include the case now under discussion. I am satisfied, upon careful examination of the authorities relied upon by respondent, and of others cited below, that the doctrine which they maintain is inapplicable to the present situation. They decide this and this only—that a witness, who has disclosed without objection part of a transaction, wherein, under circumstances tending to criminate him, he has been engaged, is bound, if thereafter questioned, to testify fully concerning that transaction. By voluntarily answering in part as to that very transaction, he is deemed to have waived that privilege of refusing to answer which he might have enjoyed at the outset, if he had chosen to solicit it.

Such seems to me a fair interpretation of the decisions in the following cases : State v. K. (4 N. H., 562); Chamberlain v. Willson (12 Vt., 491); Norfolk v. Gaylord (28 Conn., 309); Brown v. Brown (5 Mass., 320); State v. Foster (3 Foster, 354); Low v. Mitchell (18 Me., 374) ; Coburn v. Odell (30 N. H., 540); Commonwealth v. Lannan (13 Allen, 564); Commonwealth v. Price (10 Gray,

472); Foster *v.* Pierce (11 *Cush.*, 437) ; Woburn *v.* Henshaw (101 *Mass.*, 193) ; Commonwealth *v.* Nichols (114 *Id.*, 285); Commonwealth *v.* Pratt (126 *Id.*, 462) ; Alderman *v.* People (4 *Gibbs* [*Mich.*], 414).

The present case can be distinguished from all the foregoing cases in this : that, at the time the witness refused to answer the questions put to him in cross-examination, he had not disclosed any transaction, whatever, occurring within the five years as to which he subsequently declined to testify. On the other hand, in every one of the reported cases which have come under my observation, wherein the court refused to sustain a claim of privilege, on the ground that it had been waived, the immediate transaction, as to which the witness set up his right to be silent, had already been partly revealed by him. The case of State *v.* K., which has been already noted, is in this respect a fair type of all its class. I find no support, therefore, either in English or American authorities, for the respondent's claim that the witness in the present case had put himself outside the pale of his privilege, by answering certain questions preceding those which have occasioned this discussion.

This decision makes it necessary to determine whether courts are bound, as of course, to grant the claim of privilege to a witness, simply because he swears that the necessity has arisen for its exercise, or whether, on the other hand, they themselves have certain authority and discretion in the premises.

And if the latter proposition is to be maintained, there remains to be determined the further question whether, upon the facts of this particular case, the claim

of the witness was well or ill-founded, and should or should not have been allowed.

Upon this important and delicate subject, the decisions of the courts of this State throw very little light, but the history of English jurisprudence is interesting and instructive. The earliest reported case in which the question seems to have been much discussed is that of Regina *v.* Garbett (2 *Car. & Kir.*, 474). This case was argued in 1847, in the central criminal court, before twelve of the fifteen judges. Nine of them were of opinion that, if a witness claimed the protection of the court on the ground that the answer would tend to criminate him, "and there appeared reasonable ground to believe that it would do so," he was not compelled to answer. They did not decide (says the reporter), as the case did not call for it, whether the mere sworn declaration of the witness, that he believed the answer would tend to criminate him, would or would not be sufficient to protect him, where sufficient other circumstances did not induce the judge to believe that such answer would have such tendency.

The next decision of the English courts upon this subject was in 1851. In Short *v.* Mercier (15 *Jur.*, 93), which was an appeal from the vice-chancellor, in a case involving this question, the lord chancellor gives full expression to his views. Witness below had claimed protection from examination, in reference to a stock-jobbing transaction. The chancellor declares that, in view of the extensive opportunities for evasion of justice under pretense of the rule as to privilege, it is a serious duty upon every judge to see to it, as far as he can, that the privilege is not abused. "Now, the question is," he

remarks, "whether the defendants, upon the present occasion, have shown to the court sufficient circumstances to entitle them to credit for the oath which they have made, and to protect them from answering the questions." He then reviews the testimony in the case, at length, and concludes by holding that the refusal to answer was, under the circumstances, properly sustained. "It is difficult," he adds, "to say how little or how much is required; but this, at least, will satisfy the rule: If a party states circumstances, which, on the face of them, are not only consistent with the existence of the peril, but which also render it extremely probable (it may be stated in much less forcible terms than that), he entitles himself to the protection. I admit there may be cases in which it would be extremely difficult to say enough is disclosed to satisfy the judge that a privilege ought to be allowed."

During the next year (1852), the case of Fisher v. Ronalds was decided in the court of common pleas (12 Com. Ben., 762; 17 Jur., 373). A witness, who was called to prove that a bill of exchange was given for losses at play, having testified that he was present in a room in his own house, when the transaction was claimed to have taken place, but that he saw no gaming, was asked: "Was there a roulette table in the room?" He was cautioned by the court, and claimed his privilege. In the course of a colloquy between opposing counsel and the court, counsel suggested that it was for the judge to decide, as soon as the witness declined to answer, whether the question had a tendency to criminate him, and that here the question was too remote.

MAULE, J.—"It is impossible for any one but the

witness to say whether his answer will or will not tend to criminate him. If the judge is to require the witness to point out how his answer would criminate him, the privilege would be worse than useless. How can you say that, with other circumstances, the witness might not thereby be convicted of keeping a gaming-house?"

*Counsel.*—"If the witness is to be the sole judge, an unwilling or corrupt witness will always be able to defeat justice, if the parties in court are to be bound by his refusal to answer."

MAULE, J., persisted, nevertheless, that it was for the witness to say whether he believed that the answer would tend to criminate, and that his declaration was conclusive.

It will be observed that, in the case just cited, both MAULE, J., and JERVIS, C. J., gave to the privilege of a witness far wider range than it was ever allowed before, or has ever been allowed since, by the English courts. The former intimated, however, and so did WILLIAMS, J., that the occasion did not call for any absolute decision upon the general proposition whether a court was bound by the refusal of a witness, as the criminating tendency of the question in the case then under review was very manifest.

Next came, in 1855, the case of Osborn *v.* London Dock Company (10 *Exch.*, 698), in which this matter was much discussed. PARKE, B., inclined to the view that a witness should satisfy the court that the effect of his answering the obnoxious question would tend to endanger him. He referred to the case of Regina *v.* Garbett (*supra*), stating that such was the opinion of a majority of the judges, although they refrained from deciding the

precise point; and he cited also the opinion of Lord Chancellor TRURO, in the case of Short *v.* Mercier (*supra*).

Next followed, in 1857, the case of Sidebottom *v.* Adkins (3 *Jurist N. S.*, Pt. 1, 631). The vice-chancellor said there was no doubt about the rule. The difficulty was as to the application, which was one of public policy. He said that some surprise had been excited in his mind, by the alleged opinions of the late Chief Justice JERVIS and Mr. Justice MAULE (see Fisher *v.* Ronalds, *supra*). They had intimated that it was enough, if the person interrogated should declare, upon his oath, his opinion that his answer would tend to criminate him, and that he was to be the sole judge upon this subject. The vice-chancellor declared that such ruling was not countenanced by the other authorities ; that there might be cases in which, from their nature, a witness ought to be allowed to be the sole judge ; but that to hold broadly, that the court was concluded by the statement of the witness, was "going far beyond anything that could be justified." He declared his approval of the doctrine laid down in *Phillips on Evidence*, that the court must, according to the circumstances of the case, judge whether the statement of the witness should be deemed conclusive. This decision is of special importance, as in this instance it was held that the witness was not privileged. He had "vaguely and generally," the court said, "forming his own opinion of the law, and taking it into his own hands, chosen to state that opinion upon oath, as a reason for not answering interrogatories which did not, on their face, appear to be links in

a chain of evidence which would lead to a criminal prosecution."

The question was mooted again in the common pleas, in 1861 (*Exp.* Fernandez, 10 *Com. Ben. N. S.,* 39). This was a proceeding to punish for contempt a witness who had refused to answer after the trial court had passed adversely upon his claim of privilege. WILLES, J., says: "As to the objection that the witness's refusal to answer was no offense, because it was for the witness and not the judge to determine whether the question was one which he was bound to answer, that is a startling proposition. Every person in the kingdom, except the sovereign, may be called upon and is bound to give evidence, to the best of his knowledge, upon any question of fact, material and relevant to an issue tried in any of the queen's courts, unless, etc. Some judges, out of tenderness for the witness, have held it a sufficient excuse if he swears that, in his opinion—where such opinion may be well founded—his answering will tend to criminate him. Some have thought this too lax and yielding a practice, but there has never been any doubt that it is for the court to decide whether the circumstances judicially before it are such as to excuse the witness from answer."

The latest decision of the English courts is that of Regina *v.* Boyes (fully reported in 1 *Best & Smith*, 329). This case was determined in the court of queen's bench in 1861. Says COCKBURN, Ch. J., pronouncing the opinion: "It was contended that a bare possibility of legal peril was sufficient to entitle a witness to protection; nay, further, that the witness was the sole judge as to whether his evidence would bring him into danger of the law, and that the statement of his belief to that effect, if

not manifestly made *mala fide*, should be received as con-
clusive.    With the latter of these propositions we are al-
together unable to concur.    Upon a review of the author-
ities, we are clearly of the opinion that, to entitle a party
called as a witness to the privilege of silence, the court
must see, from the circumstances of the case and the
nature of the evidence which the witness is called to give,
that there is reasonable ground to apprehend danger to
the witness from his being compelled to answer.    We,
indeed, quite agree that, if the fact of the witness being
in danger be once made to appear, great latitude should
be allowed to him in judging for himself of the effect of
any particular question ; there being no doubt, as ob-
served by ALDERSON, B., in Osborn *v.* London Dock
Company, that a question which might appear at first
sight a very innocent one might, by affording a link in
a chain of evidence, become the means of bringing home
an offense to the party answering.    Subject to this reser-
vation, a judge is, in our opinion, bound to insist on a
witness answering, unless he is satisfied that the answer
will tend to place the witness in peril.    Further than this,
we are of the opinion that the danger to be apprehended
must be real and appreciable with reference to the
ordinary operation of law in the ordinary course of
things. . . .    The object of the law is to afford *to* a par-
ty, called upon to give evidence in a proceeding *inter
alios*, protection against being brought by means of his
own evidence within the penalties of law.    But it would
be to convert a salutary protection into a means of
abuse, if it were to be held that a mere imaginary possi-
bility of danger, however remote and improbable, was

sufficient to justify the withholding of evidence essential to the ends of justice."

The foregoing cases abundantly establish that, by the English authorities, the bare oath of a witness, that an answer may tend to criminate him, is not deemed of itself conclusive, but that the judge is called upon to exercise his discretion in determining, whenever the privilege is asserted, whether an occasion has arisen for its rightful exercise. The witness, in every case, must pledge his oath as to his own view of the matter. In many, and doubtless in most, instances, this of itself will and should satisfy the court ; but it " does not preclude the court from further investigation." I have found no important American authority, which seems to be in conflict with the English view.

The case of People v. Mather has been sometimes referred to as supporting the doctrine that the question of privilege is to be determined solely by the witness himself. That case does not maintain any such doctrine. At the trial of Mather, for conspiring with others to abduct William Morgan, a witness was asked whether, on the evening of September 13 (that being the date when the offense was claimed to have been committed), he was at the house of Solomon C. Wright, in New Fane (that being the place where there was evidence to show the abducting party assembled). The witness declined to answer the question, on the ground that the answer might criminate him in the very transaction under investigation. The trial court ruled in his favor, and its ruling was sustained by the Supreme court. Judge MARCY elaborately discusses the question whether the circumstances, apparent to the trial court at the time the

witness asserted his privilege, were such as to justify the refusal to answer. He intimates that the disclosures of the evidence, at that stage of the trial, were such as to suggest the possibility that Morgan had been murdered, and that, accordingly, an affirmative answer to the question put to the witness might furnish a link in a chain of evidence against him, as a participant in a felonious homicide. Judge MARCY states his conclusion broadly, in these words (People v. Mather, 4 *Wend.*, 229): "My conclusion is  .  .  .   that, where a witness claims to be excused from answering because his answer will have a tendency to implicate him in a crime, the court is to determine whether the answer he may give to the question can criminate him, directly or indirectly .  .  .  . and if they think the answer may, in any way, criminate him, they must allow his privilege without exacting from him to explain. If the witness was obliged to show how the effect is produced, the protection would at once be annihilated. The means which he would be, in that case, compelled to use to obtain protection, would involve the surrender of the very object for the security of which the protection was sought."

It seems to me that, upon the supposed authority of certain phrases and sentences in this opinion, a doctrine is urged in the present case, that would never have been sanctioned by the court which passed upon the case of Mather. Such was the posture of affairs at that trial, when the witness was asked the question objected to, that, without any further inquiry whatever, the trial judge could readily perceive how an affirmative answer might form a link in a chain of evidence, implicating the

witness in a criminal charge of the gravest character known to the law.

In the case at bar, on the other hand, the referee had nothing whatever before him, upon which he could base any opinion or judgment as to whether any peril might possibly result to the witness from his answering the questions proposed. Indeed, the status of this case seems to be no otherwise than if, immediately upon his coming to the stand, the witness had refused to answer any question whatever, under the claim that its answer would tend to criminate him. For, if he could absolutely hide from scrutiny five years of his life, he could, with equal propriety and justice, hide ten or twenty, or all the years since his birth.

The ruling of Chief Justice MARSHALL, at the trial of Burr, has also been frequently cited, as if it accorded to a witness the very sweeping privilege which is here claimed by petitioner's counsel (1 *Burr's Trial*, 243, 1807). It was urged, in Burr's behalf, that a witness must be, in the nature of things, the sole judge of the effect of his testimony, and that he might, therefore, refuse to answer any questions whatever, if he would declare upon his oath that an answer thereto might criminate him. The chief justice remarked that he thought the principle was too broadly stated; that he had considered the authorities cited in its support; that, in all of them, it could be perceived how an answer to the question might criminate the witness; and that they did not appear to him to support the principle in the full latitude in which it was stated. In the course of his decision, Judge MARSHALL says: "When two principles come in conflict with each other, the court must give them

both a reasonable construction. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. When a question is propounded, it belongs to the court to consider and decide whether any direct answer to it can implicate the witness." The chief justice then refers to the particular facts of the case before him, and decides that the witness must answer the question, despite his objection.

That the refusal of the witness is under some circumstances open to review by the court, is also sustained in Commonwealth v. Braynard (*Thacher's Criminal Cases*, 146) ; Ward v. State (2 *Mo.*, 98) ; Richman v. State (2 *Greene* [*Iowa*], 532) ; Floyd v. State (7 *Texas*, 215) ; Janvrin v. Scammon (9 *Foster*, 289) ; Kirschner v. State (9 *Wis.*, 140) ; *Greenleaf on Evidence* [13 ed.], § 451 ; Forbes v. Willard (37 *How. Pr.*, 193).

Now, unless the claim is well founded, that the trial court is absolutely bound by the oath of the witness, I cannot see how the action of the referee in the present matter can be sustained. I have been able to find no reported case, in which this privilege of refusing to answer on account of possible peril has been successfully invoked, where the nature of the question did not, under the particular circumstances, apparent at the time, immediately suggest the reasonableness of the claim and the injustice of denying it. This subject has already been discussed at such length that no review of decided cases is practicable, but the correctness of the proposition above stated will be apparent upon examination.

At the time the witness Youngs refused to answer, no subject had been broached which even faintly suggested his possible connection with the commission of a crime. It was of the highest importance for the respondent to learn from the witness himself, whose claim to be Theophilus Youngs was the very matter in dispute, where he had been and what had been his surroundings from the time in 1875 when, as she claimed, the real Theophilus Youngs had died, up to that time, in 1880, when the witness stated that he had re-appeared in Boston after an absence of five years. Without any intimation, whatever, as to the necessity for his reticence upon this vital subject, save his own bare statement that his answer might tend to criminate him, the witness flatly refused to give any testimony as to his whereabouts during all that five years, or as to any incidents of his life, or any circumstances whatever which might have been the subject of after-investigation by the respondent, and possibly have tended to show that he was not, in fact, Theophilus Youngs, because he was somebody else.

To claim that, under these circumstances, the refusal to answer should have been allowed is to exalt the privilege of a witness much farther above the rights of parties and the prerogatives of courts than seems to be consistent with a due administration of justice. If such a view of the law is correct, any person summoned to testify who chooses to assert, however absurdly or whimsically or corruptly, that to answer questions at all may tend to criminate him, must be indulged by the court, and suffered to go his way in silence ; and this, too, without risk of contempt proceedings, for, if he is legally justified in his refusal, he does not, by such refusal,

render himself amenable to punishment or even censure. Another consequence must follow, if the doctrine of privilege is to be admitted in its widest extent. Despite the long line of authorities, holding that an accomplice who has once offered himself as a witness must disclose the whole story of his connection with the offense under investigation, such an accomplice, after opening the door of inquiry as far as suits his pleasure, may safely slam it in the face of a cross-examiner, if he is but discreet enough to claim that further disclosures may tend to threaten his security.

It seems to me that, in this matter, there are two extremes, which ought equally to be avoided : First. That of requiring from a witness, who has honestly claimed the privilege, any explanation whatever of his reason for refusing to answer, if the court can see how such answer may fairly and reasonably tend to criminate him. Second. That of permitting a witness to interpose the shield of apprehended peril, as a protection against every question which he is disinclined to answer, although there may be nothing in the circumstances of the case, which in the least suggests that such answers would be fraught with danger.

The latter extreme is quite as dangerous to public policy as the former. I shall not presume to suggest any general rule governing this subject, and doubt, indeed, whether any definite and precise rule can be prescribed. It is sufficient for the purposes of the present case to decide, as I do, that, under the circumstances disclosed to the referee at the time he sustained the refusals of the witness to answer, such refusals ought not to have been countenanced.

I accordingly refuse to vacate the order heretofore made by my predecessor, directing the recall of the witness, Theophilus Youngs, for further examination.

Ordered accordingly.